# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Thompson*, 2013 IL App (1st) 113105

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RUDOLPH THOMPSON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-3105 |
| Filed | September 27, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction and sentence for first degree murder arising from an attempted armed robbery were upheld where the prosecutor's closing arguments were not improper, the trial court did not err in instructing the jury on gang evidence, even though defendant's motion to bar such evidence had been granted earlier, the constitutionality of the mandatory firearm sentencing enhancement was upheld, and defendant forfeited the claim that the trial court improperly bifurcated the sentence into two sentences, instead of one sentence incorporating the mandatory firearm enhancement; however, where the mittimus reflected two sentences and this conflicted with the common law record, it was corrected to reflect a conviction on one count of first degree murder with a sentence of 50 years and a 40-year firearm enhancement. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-14684; the Hon. Nicholas R. Ford, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Lindsey J. Anderson, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Jon Walters, and Michael G. Gamboney, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. |
| | Justices McBride and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1        After a jury trial, defendant Rudolph Thompson was convicted of first degree murder and was sentenced to 50 years in the Illinois Department of Corrections. Defendant was also sentenced to an additional 40 years for personally discharging the firearm that proximately caused the victim's death, pursuant to a mandatory firearm enhancement that required him to receive an additional 25 years to natural life, bringing his total sentence to 90 years in the Illinois Department of Corrections. On appeal, defendant argues that he is entitled to a new trial because (1) the prosecutor made a number of errors that, individually or cumulatively, so infected the trial that defendant did not receive a fair trial; and (2) during *voir dire*, the trial court instructed the jury on gang evidence despite having earlier granted defense counsel's motion *in limine* to bar the introduction of such evidence in the State's case-in-chief. Additionally, defendant asks us to reduce his sentence or remand for resentencing because (1) the 25-years-to-natural-life mandatory firearm enhancement is unconstitutionally vague and (2) the trial court improperly bifurcated defendant's sentence instead of considering the enhanced range, resulting in an excessive sentence. For the reasons that follow, we affirm but order the mittimus to be corrected.

¶ 2                               BACKGROUND
¶ 3                          I. Pretrial Proceedings
¶ 4        On August 19, 2009, defendant was indicted for, *inter alia*, first degree murder and attempted armed robbery for the shooting death of victim Francisco Villanueva. On June 21, 2011, the defense filed a motion *in limine* to preclude the State from eliciting or arguing evidence of any gang affiliation of defendant, as well as a motion *in limine* to prevent testimony that defendant was using illegal narcotics at or near the time of the shooting. The trial court granted the defense's motion concerning gang affiliation "as it relates basically to

the State's case in chief," but indicated that "depending on the evidence as it is adduced it is possible that this Court will allow certain gang evidence to come in should I deem it relevant at a later time either by way of explanation of a change of testimony by one of the witnesses or any other unforeseen circumstance that might occur. I will deal with it on a case by case question by question basis." The trial court denied defendant's motion concerning drug consumption, finding that "the basis of knowledge on the part of *** the three eyewitnesses for the State[ ] is predicated on a social circumstance in which drugs were used" and the drug use was more probative than prejudicial on the issue of defendant's state of mind and to indicate why the witnesses were together; the court also noted that "I could see relevance both for the State and the Defense in that certainly their drug consumption in the evening or early morning hours before they witness a shooting could have probative value on their ability to observe or whatever testimony they offer regarding the defendant's conduct."

¶ 5                                    II. Trial

¶ 6                                 A. Jury Selection

¶ 7        Jury selection occurred on August 26, 2011. While addressing the venire, the trial court stated:

"THE COURT: There may be evidence in this case–I am talking to the 28 people I just questioned–of gang membership. What I want to tell you *** is that gang membership in and of itself cannot be considered by you because he or she is in a gang, that they are guilty of a crime.

Does everybody understand that?

PROSPECTIVE JURORS: Yes.

THE COURT: It is just a part of the evidence, but it is not the thing that should make you make your decision. It is another thing to consider along with all the other evidence in this case in reaching your verdict.

Would everyone follow that law in this case?

PROSPECTIVE JURORS: Yes.

THE COURT: Anyone take issue with it?

No one is indicating.

Understand it is something that you can consider, but it is not a reason to say in and of itself, in other words, just [because] he sat down and said I am in the Insane Pastry Cooks, right, that is not enough in and of itself to convict a person.

Does everybody understand that?

PROSPECTIVE JURORS: Yes.

THE COURT: You have to listen to the evidence and decide the case by the evidence."

¶ 8                                    B. State's Case-in-Chief

¶ 9        Defendant's trial began on August 29, 2011. The State's witnesses included three witnesses to the shooting and the testimony of defendant's ex-girlfriend, who claimed that defendant confessed to the shooting.

¶ 10                                    1. Christopher Smith

¶ 11       Christopher Smith, whose his nickname was "BC" or "Black Chris," testified that he had two prior felony convictions. Smith first met defendant in grammar school and they had known each other for approximately 10 years.

¶ 12       Smith testified that, on July 29, 2003, he met defendant at approximately 6 a.m., when Smith was driving a Cutlass down the street. He observed defendant driving down the street in a white van and asked defendant if he wanted to split the cost of some marijuana. Defendant agreed, so Smith parked his vehicle and entered defendant's van, sitting in the back. They drove down Harper Street and ran into "Cecil" and "Corn,"[1] whom Smith had known for approximately five years; Smith testified that he had a child with Corn's sister Carla. Cecil and Corn offered to share their marijuana with defendant and Smith, so they entered the van. They drove to a gas station, where defendant and Cecil switched seats so that Cecil was in the driver's seat and defendant was in the back. They drove around, smoking marijuana. At approximately 7 a.m., someone suggested they drive somewhere for food. They drove to a Hispanic man selling food in a little truck near CVS High School; Smith lived in the area and had seen the man before.

¶ 13       When they arrived, defendant exited the vehicle and shot the man. Smith heard a gunshot, and defendant reentered the van and said "pull off quick." Defendant was the only one outside the van; Smith was in the van on the telephone with Carla. When defendant returned to the van, he had a rifle, approximately 18 to 20 inches long, and Smith observed the man from the truck lying on the ground. They drove to 92nd and Essex, and Smith told defendant that he was "bogus" for shooting the man. When they arrived, everyone exited the van and went their separate ways; Smith entered a nearby house.

¶ 14       Smith testified that, on April 1, 2009, he was visited by police while incarcerated at Logan Correctional Center. He did not speak to them that day, but agreed to speak with them at another location, so on April 13, 2009, he was brought before a grand jury and talked to the police on that day. Smith testified that he was not promised anything on either April 1 or April 13, although he had a chance to speak with his mother on April 13, and did not receive any type of consideration for testifying.

¶ 15       On cross-examination, the defense asked Smith whether defendant owned a white van, and Smith responded that "[h]e was in one." Smith admitted that he did not tell anyone about the shooting until he was approached by the police in 2009. Smith testified that he did not observe the gun until after the shooting.

---

[1]"Cecil" is Cecil Barren and "Corn" is Cornelius Jones.

¶ 16                                    2. Cecil Barren

¶ 17      Cecil Barren, the State's next eyewitness, testified that he had two prior felony convictions and one pending case; Barren testified that he had received no promises of help on those cases from anyone, including the State or the police.

¶ 18      Barren testified that, on July 29, 2003, he was working in the early morning hours, selling drugs with his friend Cornelius Jones at 92nd and Harper. After they finished selling their drugs, he and Cornelius met with defendant and BC when they pulled up in a conversion van. Cornelius asked defendant to take them to purchase marijuana, and the two entered the van. They purchased marijuana, and Barren switched seats with defendant, so that BC and defendant were in the back, while Barren and Cornelius were in the front; Barren switched seats "because I don't roll blunts real good. I just smoke them, to tell the truth." They smoked marijuana while driving around until the sun came up. After they finished smoking, Cornelius suggested they drive to 87th Street and buy tacos from the food truck that was always near CVS High School.

¶ 19      They pulled up next to the food truck, facing east; the food truck was facing west. Cornelius was planning on exiting the van to order the tacos, "and [defendant] said look at that rack in his hands"; Barren explained that the food truck operator had a large amount of money in his hands. Before anyone could respond, defendant jumped out of the van, holding "[s]ome type of machine gun with a long banana clip on it." Defendant pointed the gun at the man and asked the man for the money, and the man turned and grabbed the barrel of the gun. Defendant shot the man two or three times.

¶ 20      Barren testified that he was able to observe the shooting and was still sitting in the driver's seat of the van, and that the man fell to the ground when he was shot. Defendant jumped back into the van and told Barren to "pull off, don't stop for no police"; defendant still held the gun in his hand. Barren drove away, and pulled over at approximately 93rd Street. Everybody exited the van and went their separate ways; defendant and BC went one way, while Barren and Cornelius went another. As he was exiting the van, Barren observed defendant wrap the gun in a piece of clothing and throw it on the side of a house. Barren and Cornelius walked back toward Barren's home.

¶ 21      Barren again met defendant a few weeks later, when Barren was with Cornelius. Defendant "was just saying keep our mouth closed, we got away with it, you know what I'm saying, don't say nothing to nobody or he going to have to hurt us, is what he said." Barren never went to the police to inform them what happened because "I was afraid for my life." He was interviewed by the police, but did not tell them the truth; he told them everything except that he was the driver of the van. He explained that "I didn't tell them that I was driving because I didn't want to go down for something that he just did off a split, you know, not thinking. I didn't want to go down for something he did. I had no plans on none of this happening."

¶ 22      On cross-examination, the defense asked Barren who the van belonged to, and Barren responded "I was under the assumption that it was [defendant's] van because he was driving it." Barren testified that he did not observe the gun until defendant pulled it from under the seat and used it. Barren further testified that he was handcuffed and brought in for

questioning by the police concerning the crime, where he lied and said that Cornelius was driving before eventually admitting that he was the driver.

¶ 23                                  3. Cornelius Jones

¶ 24      Cornelius Jones, the State's third eyewitness, testified that he was currently awaiting trial on a felony case and had previously been convicted of two felonies. Jones testified that the night of July 28, 2003, he was selling drugs on 92nd and Blackstone with Cecil Barren until approximately 4:30 or 5 a.m. on July 29. After they stopped selling drugs, they ran into defendant, whom Jones had known since high school, or approximately eight years. Defendant pulled up, driving a light blue Cutlass, on 92nd and Harper. Defendant was in the presence of BC, or Christopher Smith, who was asleep in the backseat. Jones and Cecil asked defendant to take them somewhere to get something to eat, and, after defendant agreed, they entered the vehicle. They drove aimlessly for a while because they could not decide what they wanted to eat. BC woke up and told defendant to pull over because he needed to use the bathroom; defendant pulled over near an alley. Defendant and BC went into the alley and, when they came back, they told Jones and Cecil that they needed to drop them off because the vehicle was too small for them. They dropped Jones and Cecil back at 92nd and Harper, and returned in a van to take them to find food. Defendant was driving the van, Cecil was in the front seat, and Jones and BC were in the back. They decided to visit the "taco man," who sold tacos from a truck on 87th and Jeffrey.

¶ 25      Jones testified that, on their way to the food truck, Cecil and defendant decided to switch seats because defendant "almost kind of like got out of control with the van" and a police vehicle was behind them; Cecil was then driving and defendant was in the front seat. Cecil drove to the food truck, which was near CVS High School. They pulled up beside the truck after some students had passed, facing in the opposite direction from the truck. Defendant "saw the man giving some change to one of the students or whatever, and he said, I'm fixin' to get him." Jones "gave him like a nervous chuckle" and told him "don't do that dumb s***"; Jones thought that defendant was planning to rob the taco man. Jones reached for the back door, and defendant jumped out of the front passenger seat, pulling a gun "from I don't know where"; the gun looked like a rifle, approximately 18 to 24 inches long. Defendant said something to the taco man, who had his back to defendant. The taco man turned, observed the gun, and grabbed it and pushed it down "just like out of instinct." Jones heard gunshots and observed the taco man running away, then falling down. After defendant shot the taco man, he jumped back into the van and closed the door; he had the gun sitting in his hands and lap and told Cecil to "pull off." Cecil drove away.

¶ 26      When the van stopped, Jones exited the van and began walking home. As he was leaving, he observed defendant pick a shirt or jacket up off the floor of the van; defendant still held the gun in his hand. Cecil caught up to Jones and they walked home.

¶ 27      A few years later, defendant walked up to where Jones, his sister, and Cecil were sitting on Jones' grandmother's porch. Defendant said that "somebody talking, somebody snitching." Jones "immediately threw my hand up like it wasn't me, it ain't me, you know." Defendant "kind of looked at me and chuckled and just walked off." Jones never told the

police about the shooting, but the police eventually approached him in 2009 while he was incarcerated. Jones told the police what happened, but left out the part about BC being present, because "BC has a child with my sister, with my younger sister. So we like family. So I figured, like, if I didn't have to involve him and, you know, I could get this over with without involving him, I didn't want to involve him." Eventually, he informed the police about BC's presence.

¶ 28    On cross-examination, Jones testified that he and Cecil were smoking marijuana while selling drugs, but could not recall whether they were smoking while riding in the vehicle. Jones further testified that the van was dark-colored.

¶ 29    On redirect, Jones testified that he was not promised anything in exchange for testifying.

¶ 30                                    4. Ebony Haythorne

¶ 31    Ebony Haythorne, defendant's ex-girlfriend, testified that she had known defendant since they were 9 or 10 years old, and had a daughter with him, born in 2004. Haythorne testified that she had gone to high school at CVS and was aware of the food truck, which sold pizza, chips, and pop.

¶ 32    On the evening of July 29, 2003, Haythorne was at home watching the news on television; Haythorne lived with her grandparents and her mother. Haythorne learned on the news that the food truck operator had been killed, and was on the phone talking with a friend about it, when defendant, whom she was dating at the time, came in; defendant looked "[l]ike worried or something, just looked funny, like he seen a ghost or something." Haythorne asked what was wrong, and defendant told her that "something bad happened" and "he accidentally shot someone." Defendant explained to Haythorne that he saw someone who had shot his friend several weeks ago, and he was attempting to shoot him in retaliation when the food truck operator got in the way. Defendant informed her that he was with Cornelius, Cecil, and Chris.

¶ 33    Haythorne testified that defendant was not with her the night before the shooting. She further testified that, in 2005, the police visited her grandmother's home and asked Haythorne in the presence of her grandparents whether defendant was with her on the night the food truck operator was killed, and she told them that he was not. However, she did not inform the police that defendant had admitted to shooting him, because she was scared. Haythorne testified that, at that point, she had given birth to defendant's child.

¶ 34    Haythorne testified that she spoke with Detective Saul Del Rivero and Assistant State's Attorney Arunas Buntinas on May 22, 2009, when she informed them that defendant had admitted to killing the food truck operator.

¶ 35    On cross-examination, Haythorne testified that, while her grandmother liked defendant, he was not permitted to spend the night. However, she would sneak defendant into the house at night and sneak him out in the morning before her grandparents woke up. She did this multiple times a week, such that she was unable to specify which days he spent with her and which nights he did not; however, she knew that he was not with her on the night of the shooting. Haythorne also testified that she was familiar with defendant's sister, who would sometimes pick defendant up from Haythorne's house in the mornings.

¶ 36    Haythorne admitted that, when first interviewed by the police in 2005, she told them that defendant spent the night once or twice a week, when in fact it was more often. She also informed them that he only began spending the night after the baby was born and that in July 2003, he was not spending the night at all, because her grandparents did not know she was sneaking him in and she was interviewed in their presence. Haythorne never contacted them to speak to them outside of her grandparents' presence in order to inform them that defendant admitted to the shooting.

¶ 37    Haythorne admitted that, when her child was a year or two old, she discovered that defendant had been seeing a woman named Shaquitha in July 2003, although Haythorne did not know whether defendant was cheating on her while she was pregnant. Shaquitha was pregnant with defendant's child in May 2009, when police came to speak to Haythorne again. At that time, Haythorne informed them that defendant admitted to accidentally shooting the food truck operator.

¶ 38                          5. Police and Medical Witnesses

¶ 39    The State also presented witnesses and stipulations concerning the victim's condition and the physical evidence at the scene. John Holland, a firefighter paramedic for the City of Chicago fire department, testified that on July 29, 2003, at approximately 7:48 a.m., his station received a report of a gunshot victim at 87th and South Jeffrey on the southeast side of Chicago, near CVS High School, a vocational high school. They responded to the call and arrived at the scene at 7:52 a.m. Holland observed a Hispanic male lying on his stomach on the sidewalk; based on the amount of blood he observed, Holland believed that the man was dead upon first observing him. Holland was the first individual to reach the victim and turned him over. He observed that the victim had been shot. They moved him to the ambulance and Holland and another fireman began disrobing him and Holland prepared to intubate the victim; the ambulance began driving to Christ Hospital, approximately eight or nine miles away, within a few minutes. After disrobing the victim, Holland noticed a large hole on the right side of his body; the victim was unconscious, with no vital signs. When they arrived at the hospital, Holland transferred the victim's care to the surgeons and later learned that a doctor pronounced the victim dead on arrival.

¶ 40    The State also presented, by way of stipulation, the testimony of Officer Paul Pater, a Chicago police evidence technician; Tonia Brubaker, a firearms and toolmark examiner for the Illinois State Police crime laboratory; and Dr. Nancy Jones, Cook County medical examiner. Officer Pater would testify that, at 8:55 a.m. on July 29, 2003, he and his partner were assigned to the shooting, where they observed a catering truck parked in the parking lot of an auto repair facility on the corner of Jeffrey and 87th Street. Pater took a number of photographs at the scene and recovered three cartridge casings from the ground and one fired bullet from the door of a Toyota Camry. Brubaker would testify that the three fired cartridge casings were fired from the same firearm and that the fired bullet was a 30-caliber bullet that was consistent with having been fired from a 30-caliber carbine.

¶ 41    Dr. Jones would testify that the victim's body had evidence of injury, including a through-and-through gunshot wound on his left lower chest. The entrance wound was round

and perforated the skin and the lower lobe of the left lung. The wound course then perforated the liver and exited the right lateral back area. There was no evidence of close-range fire near the entry wound.

¶ 42 Dr. Jones would testify that the body had evidence of a second gunshot wound to the right lower back. The wound course perforated the skin and muscle, fractured the twelfth rib, perforated the liver, continued in an upward direction, and exited the lower chest through the seventh rib, fracturing the rib. There was no evidence of close-range fire near the entry wound.

¶ 43 Dr. Jones would further testify that there were two additional through-and-through gunshot wounds to the left lateral back. The shape of the wounds and manner of entry appeared to be one bullet that had broken into two pieces of shrapnel. The first perforated the skin and muscle and caused marked destruction to the liver, and exited the body through the cavity near the ninth rib, fracturing the rib. The second, approximately 0.25 inches below the first, perforated the skin and muscle, fractured the twelfth rib, caused marked destruction to the liver, and exited through the right lower chest through the tenth rib, fracturing the rib. There was no evidence of close-range fire near either of the entry wounds.

¶ 44 Dr. Jones would testify that in her opinion, to a reasonable degree of scientific certainty, the cause of death of the victim was multiple gunshot wounds and that the four gunshot wounds appeared to have come from three bullets and all of the gunshot wounds were fatal wounds.

¶ 45                                                6. Detective Oscar Arteaga

¶ 46 The State also presented the testimony of Detective Oscar Arteaga, of the Chicago police department's cold case homicide unit. Arteaga testified that he was assigned to investigate the cold case homicide of the victim. He became involved in the investigation when, on July 9, 2008, a narcotics sergeant informed him that a man in custody named Harvey Owens wanted to give information regarding a homicide. Arteaga spoke to Owens and, after that conversation, was seeking to speak with Cecil Barren, Cornelius Jones, and defendant.

¶ 47 On March 10, 2009, Arteaga and his partner, Detective Saul Del Rivero, traveled to the East Moline penitentiary to speak with Cornelius Jones. Arteaga returned to the location on March 19 with an assistant Cook County State's Attorney, and, on March 30, Jones testified before a grand jury.

¶ 48 On March 25, 2009, Arteaga spoke with Cecil Barren, who was initially placed into custody. Arteaga had placed a "stop order" for Barren, meaning that when Barren was stopped by police for any reason, Arteaga would be notified. Arteaga testified that Barren was initially placed into custody because they had information that he was the driver of the vehicle when the homicide occurred. After speaking with Barren, Arteaga did not charge Barren with anything and released him. On April 23, 2009, Barren testified before a grand jury.

¶ 49 On April 1, 2009, Arteaga, Del Rivero, and an assistant State's Attorney traveled to Logan Correctional Center to interview Christopher Smith, who was an inmate there. They interviewed Smith in a conference room that was open to other inmates. Smith was reluctant

to speak with them and often looked at the doors and windows. They asked Smith if they could interview him at a later time, and did so. On April 13, 2009, Smith testified before a grand jury and, on the same day, was permitted to speak with his mother; Arteaga did not promise Smith that he would be permitted to speak with his mother.

¶ 50     On May 12, 2009, Arteaga spoke with defendant. After that interview, Arteaga sought to interview Ebony Haythorne, defendant's girlfriend at the time of the homicide and the mother of his child. Arteaga spoke to Haythorne on May 21, 2009, at her home. The next day, she testified before a grand jury. On July 23, 2009, defendant was arrested.

¶ 51     Arteaga testified that the 30-caliber carbine cartridge casings would be fired from a carbine rifle, among other types of weapons. A 30-caliber carbine rifle "looks like a machine gun. It's approximately 20 to 26 inches. It's got a long barrel in the front and a stock, meaning like the back end of it. It's probably ten inches long, depending on the variety of the actual carbine itself, and it's a very high powered weapon and can go through a bullet proof vest." Arteaga further testified that two different types of clips could be put into a carbine rifle: a 15-round clip and a 30-round banana clip.

¶ 52     On cross-examination, Arteaga testified that, when visiting Jones in East Moline, he and Del Rivero read Jones his *Miranda* rights. Barren was also read his *Miranda* rights, and he denied being the driver of the vehicle three times. Barren was subsequently processed, after which he admitted to being the driver; Barren was released without being charged. Smith was also read his *Miranda* rights.

¶ 53                        C. Defense Case-in-Chief

¶ 54     After the State rested, the defense presented a motion for a directed verdict, which was denied.

¶ 55                        1. Shaquitha Moore

¶ 56     The defense called Shaquitha Moore as its first witness, who testified that defendant was the father of her twins, born in October 2008. Moore testified that in July 2003, she had a relationship with defendant, who was also dating Ebony Haythorne at the time. Moore visited defendant at approximately 7:30 a.m. on July 29, 2003, at his sister Tyanez's apartment, where he lived. They went to another apartment in the building, where defendant's cousin lived, and watched his cousin play a video game.

¶ 57     Moore testified that she was still in a relationship with defendant, but that she would not lie for him. She was able to recall July 29, 2003, specifically because that was the first time that she and Haythorne "got into it" over the telephone. Defendant had called Moore at approximately 6 a.m. to let her know that he was on his way to his sister's apartment and Haythorne redialed the number and reached Moore. Haythorne asked Moore questions and Moore "explained to her what was going on." Moore gave birth to defendant's twins in 2009, and Haythorne was aware of them; Haythorne and Moore argued again after their birth.

¶ 58     On cross-examination, Moore testified that she knew that defendant could not have committed the murder because he was with her. She admitted that she had never approached

the police or the prosecutors to tell them that defendant could not have committed the crime; however, on redirect, she testified that no police had ever attempted to question her.

¶ 59            2. Tyanez Thompson

¶ 60   The defense's next witness was Tyanez Thompson, defendant's sister, who testified that, on July 29, 2003, defendant was living with her in her apartment; their cousin lived in another apartment in the same building. Thompson testified that, at the time, defendant was dating both Shaquitha Moore and Ebony Haythorne. On the morning of July 29, 2003, Thompson received a phone call from defendant, after which she picked him up at Haythorne's house at approximately 7 a.m. She brought him back to the apartment building and defendant later went to their cousin's apartment.

¶ 61   Thompson testified that she had picked defendant up from Thompson's house a number of times, as did her husband, cousin, or "whoever was available to go get him with a car"; defendant often spent the night at Haythorne's house.

¶ 62            D. Closing Argument

¶ 63   During the State's closing argument, the prosecutor stated:

> "Now, ladies and gentlemen, the judge will instruct you as to the law and what you–the State has to prove here and one thing the State has the burden of proving Rudy Thompson guilty beyond a reasonable doubt and we gladly accept that burden and beyond a reasonable doubt isn't beyond any doubt in the world, any crazy doubt–"

The defense objected, and the court sustained the objection.

¶ 64   During rebuttal argument, the prosecutor commented:

> "Don't forget the defendant that night was driving in a van. No one had ever seen him with that van before. I'm not quite sure where the defendant got that van from but that's what he was driving that night."

The defense objected, and the trial court overruled the objection as "[m]ere argument."

¶ 65   The prosecution also stated:

> "As [defense counsel] said the burden is on us. It's a burden of reasonable doubt, that's our burden, we embrace it, we met it. And this isn't some mystical magical burden that's created just for Rudy Thompson, that's the burden on every case that's tried.
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Overruled.
>
> PROSECUTOR: That's the burden on every case that's tried in front of Judge Ford in this courtroom and every courtroom in this building and every courtroom in the United States of America. It's our burden and we've met it. And along with that burden the defense doesn't have any burden. They don't have to put on witnesses but when they do put on witnesses you have to assess their witnesses the same way you'd assess any other witness in this case.

* * *

They are lying because they have a vested interest in the defendant being found not guilty. But what this case is about is about justice for this man, Francisco Villanueva. It's about–It's about a case with overwhelming evidence and accepting responsibility for your actions. Here in front of you is a guy who is absolutely utterly unwilling to accept any responsibility for his actions. Thankfully today–

DEFENSE COUNSEL: Objection, Judge.

THE COURT: Overruled. Mere argument.

PROSECUTOR: Thankfully today it's not Rudy Thompson's call, it's your call. Tell him he's responsible for his actions. Find the defendant guilty of the first degree murder of Francisco Villanueva, of firing the shots that killed Francisco Villanueva and as well for the attempt armed robbery of Mr. Villanueva."

¶ 66    After approximately an hour, the jury reached a verdict of guilty on the counts of first degree murder and attempted armed robbery. The jury also found that during the commission of the first degree murder, defendant personally discharged a firearm that proximately caused the death of another person.

¶ 67                        III. Posttrial Proceedings

¶ 68    The trial court denied defendant's request for a new trial and, after considering factors in aggravation and mitigation, sentenced defendant:

"For the offense of first degree murder today, I will sentence the defendant, Mr. Rudolph Thompson, to 50 years in the Illinois Department of Corrections.

As the person who personally discharged the weapon that approximately [*sic*] caused death, I will sentence the defendant to 40 years in the Illinois Department of Corrections. That's a total of 90 years Illinois Department of Corrections for which he will have to serve everyday [*sic*]."[2]

In imposing defendant's sentence, the trial court recounted the testimony of the three individuals in the vehicle with defendant, noting that all three were "disdainful of the defendant's conduct" and that, despite their "somewhat of a checkered past," "this offense to them cross[ed] the line." The trial court characterized defendant's conduct as "brutal" and noted that he was remorseful in court, but also noted that defendant had six felony convictions and that "the system has forced it upon Mr. Thompson, almost every form of punishment that can be imagined. *** He doesn't come to me with clean hands as it relates to a criminal background." The court pointed out that defendant had several children, but that "I don't know what meaningful support he's ever given his children, because he's never been gainfully employed." Finally, the court noted that defendant was a gang member and admitted to selling drugs to support himself, concluding that "[t]his is [not] in any sense of

_____

[2]Although the jury found defendant guilty of attempted armed robbery, there was no sentence imposed, nor was attempted armed robbery discussed at the sentencing. Since the State made no objection at sentencing, did not raise the issue in a postsentencing motion, and does not make any argument on appeal, any argument as to the attempted armed robbery is forfeited.

-12-

the word, anyone that's contributed much to our society."

¶ 69    The trial court denied defendant's posttrial motion to reconsider sentence, and this appeal follows.

¶ 70                                ANALYSIS

¶ 71    On appeal, defendant argues that he is entitled to a new trial because (1) the prosecutor made a number of errors that, individually or cumulatively, so infected the trial that defendant did not receive a fair trial; and (2) during *voir dire*, the trial court instructed the jury on gang evidence despite having earlier granted defense counsel's motion *in limine* to bar the introduction of such evidence in the State's case-in-chief. Additionally, defendant asks us to reduce his sentence or remand for resentencing because (1) the 25-years-to-natural-life mandatory firearm enhancement is unconstitutionally vague and (2) the trial court improperly bifurcated defendant's sentence instead of considering the enhanced range, resulting in an excessive sentence. We consider defendant's arguments in turn.

¶ 72                          I. Prosecution Errors

¶ 73    Defendant first argues that the prosecution made a number of errors that deprived him of a fair trial. Specifically, defendant argues that (1) the prosecutor improperly commented on defendant's right not to testify and his unwillingness to "accept responsibility"; (2) the prosecutor improperly attempted to define the meaning of "beyond a reasonable doubt" to the jury; (3) the prosecution improperly implied that defendant stole the van he was driving on the morning of the shooting; and (4) the prosecution improperly sought the admission of evidence of defendant's drug use on the day of the shooting.

¶ 74                         A. Closing Arguments

¶ 75    Defendant's first three arguments concern conduct of the prosecution during its closing argument. It is not clear whether this issue is reviewed *de novo* or for abuse of discretion. We have previously made this same observation in several cases, including *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 149-51, *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009), and *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008). The Second District Appellate Court has agreed with our observation that the standard of review for closing remarks is an unsettled issue. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26; *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009).

¶ 76    The confusion stems from an apparent conflict between two supreme court cases: *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Blue*, 189 Ill. 2d 99, 128, 132 (2000). In *Wheeler*, our supreme court held that "[w]hether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *Wheeler*, 226 Ill. 2d at 121. However, the supreme court in *Wheeler* cited with approval *Blue*, in which the supreme court had previously applied an abuse of discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had held that the substance and style of closing arguments is within the trial court's

discretion and will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 128, 132; *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Emerson*, 189 Ill. 2d 436, 488 (2000); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court had reasoned that "[b]ecause the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse of discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

¶ 77      Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review. The second and third divisions of the First District have applied an abuse of discretion standard, while the Third and Fourth Districts and the fifth division of the First District have applied a *de novo* standard of review. Compare *People v. Love*, 377 Ill. App. 3d 306, 313 (1st Dist. 2d Div. 2007), and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (1st Dist. 3d Div. 2008), with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (4th Dist. 2008), and *People v. Ramos*, 396 Ill. App. 3d 869, 874 (1st Dist. 5th Div. 2009).

¶ 78      However, we do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard. This is the same approach that we took in both *Phillips* and *Johnson*, and was the same approach taken by the Second District in its *Robinson* and *Burman* opinions. *Phillips*, 392 Ill. App. 3d at 275; *Johnson*, 385 Ill. App. 3d at 603; *Robinson*, 391 Ill. App. 3d at 840; *Burman*, 2013 IL App (2d) 110807, ¶ 26. As such, we turn to the merits of defendant's arguments.

¶ 79      The State's closing argument will lead to reversal only if the prosecutor's improper remarks created "substantial prejudice." *Wheeler*, 226 Ill. 2d at 123; *People v. Johnson*, 208 Ill. 2d 53, 64 (2003); *People v. Easley*, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice."). Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." *Wheeler*, 226 Ill. 2d at 123 (citing *People v. Linscott*, 142 Ill. 2d 22, 28 (1991)).

¶ 80      When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. *Wheeler*, 226 Ill. 2d at 122; *Johnson*, 208 Ill. 2d at 113; *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004). Prosecutors are afforded a great deal of latitude in closing argument. *Wheeler*, 226 Ill. 2d at 123; *Blue*, 189 Ill. 2d at 127. They may comment on the evidence and draw reasonable inferences therefrom, as well as dwelling on the " 'evil results of crime' " and urging the " 'fearless administration of the law.' " *People v. Liner*, 356 Ill. App. 3d 284, 295-96, 297 (2005) (quoting *People v. Harris*, 129 Ill. 2d 123, 159 (1989)). However, a prosecutor may not make an argument that serves no purpose but to inflame the jury. *Blue*, 189 Ill. 2d at 128 (citing *People v. Tiller*, 94 Ill. 2d 303, 321 (1982)).

¶ 81         1. Defendant's Right Not to Testify

¶ 82  Defendant first argues that the prosecutor made a direct attack on defendant's right not to testify at trial when he stressed that the case was about "accepting responsibility for your actions" and that defendant was "utterly unwilling to accept responsibility for his actions." A defendant has the right not to testify as a witness on his own behalf, and a prosecutor may not comment, directly or indirectly, on the exercise of that right. *People v. Arman*, 131 Ill. 2d 115, 125-26 (1989). "The appropriate test for determining whether a defendant's right to remain silent has been violated is whether 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' " *People v. Dixon*, 91 Ill. 2d 346, 350 (1982) (quoting *People v. Hopkins*, 52 Ill. 2d 1, 6 (1972)). "In making that determination, a reviewing court should examine the challenged comments in the context of the entire proceeding." *Arman*, 131 Ill. 2d at 126 (citing *United States v. Robinson*, 485 U.S. 25, 32 (1988)); see also *People v. Johnson*, 208 Ill. 2d 53, 112 (2003).

¶ 83  In the case at bar, we cannot find that the prosecutor's comments were " 'intended or calculated to direct the attention of the jury' " to defendant's choice not to testify. *Dixon*, 91 Ill. 2d at 350 (quoting *Hopkins*, 52 Ill. 2d at 6). The prosecution referred to "accepting responsibility" in its rebuttal:

> "But what this case is about is about justice for this man, Francisco Villanueva. It's about–It's about a case with overwhelming evidence and accepting responsibility for your actions. Here in front of you is a guy who is absolutely utterly unwilling to accept any responsibility for his actions. Thankfully today–
>
> DEFENSE COUNSEL: Objection, Judge.
>
> THE COURT: Overruled. Mere argument.
>
> PROSECUTOR: Thankfully today it's not Rudy Thompson's call, it's your call. Tell him he's responsible for his actions. Find the defendant guilty of the first degree murder of Francisco Villanueva, of firing the shots that killed Francisco Villanueva and as well for the attempt armed robbery of Mr. Villanueva."

Defendant argues that, since he did not plead guilty, the only other way to "accept responsibility" in a criminal proceeding is by testifying, and so the prosecutor's comments necessarily implicated defendant's failure to testify. We cannot agree. The prosecutor's comments during rebuttal focused on defendant's flight from the crime scene and disposal of the gun, which would also relate to a failure to take responsibility, and had no reference whatsoever to defendant's choice not to testify. Thus, after examining the comments in context, we cannot find that these comments invited any sort of attention to defendant's choice not to testify.

¶ 84  We do not find defendant's use of *People v. Hawkins*, 284 Ill. App. 3d 1011 (1996), to be persuasive. In that case, the prosecutor stated:

> " 'Now, the Defendant has exercised his rights here, and he has basically chosen not to plead to this particular charge because he doesn't want to accept responsibility for what he has done.

Well, as voices of the community, you mush show him that he is going to be responsible for his actions.' " *Hawkins*, 284 Ill. App. 3d at 1017.

We found these comments improper, finding them similar to a case in which the prosecutor had specifically referred to a defendant's failure to testify. *Hawkins*, 284 Ill. App. 3d at 1018 (citing *People v. Burton*, 44 Ill. 2d 53, 57 (1969)).

¶ 85     There is no similarity between the case at bar and *Hawkins*. In *Hawkins*, the prosecutor explicitly connected a failure to plead guilty to a failure to accept responsibility. *Hawkins*, 284 Ill. App. 3d at 1018. In the case at bar, by contrast, the prosecutor only referred to a failure to accept responsibility. Defendant's choice not to testify is not mentioned anywhere in the State's closing, and we cannot accept defendant's argument that the reference to accepting responsibility was calculated to draw the jury's attention to defendant's silence. Accordingly, we find no error in the State's argument on this basis.

¶ 86                     2. Definition of "Beyond a Reasonable Doubt"

¶ 87     Defendant next claims that the prosecutor erred by attempting to define the meaning of "beyond a reasonable doubt" for the jury. "The law in Illinois is clear that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury." *People v. Speight*, 153 Ill. 2d 365, 374 (1992). "The danger is that, no matter how well-intentioned, the attempt may distort the standard to the prejudice of the defendant. If sufficient prejudice results, reversal is warranted." *People v. Keene*, 169 Ill. 2d 1, 25 (1995). " 'However, both the prosecutor and defense counsel are entitled to discuss reasonable doubt and to present his or her view of the evidence and to suggest whether the evidence supports reasonable doubt.' " *People v. Burney*, 2011 IL App (4th) 100343, ¶ 67 (quoting *People v. Laugharn*, 297 Ill. App. 3d 807, 811 (1998)). In so doing, "[a] prosecutor may argue that the State does not have the burden of proving the guilt of the defendant beyond *any* doubt, that the doubt must be a reasonable one. Such an argument does no more than discuss the grammatical fact that the word 'reasonable' modifies the word 'doubt.' " (Emphasis in original.) *People v. Carroll*, 278 Ill. App. 3d 464, 467 (1996).

¶ 88     In the case at bar, defendant points to two comments by the State that he claims improperly defined "beyond a reasonable doubt," only one of which was properly preserved for review. With regard to the other comment, Illinois law is clear that both an objection and a written posttrial motion raising an issue are necessary to preserve an error for appellate review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.)). Here, although defense counsel objected to the comment, it was not included in defendant's posttrial motion. Accordingly, we review its propriety under plain-error review.

¶ 89     "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial

process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In a plain-error analysis, "it is the defendant who bears the burden of persuasion." *People v. Woods*, 214 Ill. 2d 455, 471 (2005). However, in order to find plain error, we must first find that the trial court committed some error. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

¶ 90     The first comment challenged by defendant occurred during the State's closing argument, when the prosecutor stated:

> "Now, ladies and gentlemen, the judge will instruct you as to the law and what you–the State has to prove here and one thing the State has the burden of proving Rudy Thompson guilty beyond a reasonable doubt and we gladly accept that burden and *beyond a reasonable doubt isn't beyond any doubt in the world, any crazy doubt–*." (Emphasis added.)

The defense objected, and the court sustained the objection. We cannot find that this constituted error, much less plain error.

¶ 91     As noted, "[a] prosecutor may argue that the State does not have the burden of proving the guilt of the defendant beyond *any* doubt, that the doubt must be a reasonable one. Such an argument does no more than discuss the grammatical fact that the word 'reasonable' modifies the word 'doubt.' " (Emphasis in original.) *Carroll*, 278 Ill. App. 3d at 467. See also *Burney*, 2011 IL App (4th) 100343, ¶¶ 66-68 (finding no error in statements that " ' ["]beyond a reasonable doubt["] does not mean ["]beyond all doubt["] ' " and " 'Don't raise that bar higher than it needs to be ladies and gentlemen for the State to prove. It's not beyond all doubt.' "). Here, instead of stating that the doubt must be "reasonable," the prosecutor stated that the doubt could not be "crazy." However, the focus is nevertheless on the fact that the word "doubt" is modified by "reasonable" and a "crazy"–or unreasonable–doubt would not suffice. We cannot find this to be improper.

¶ 92     Additionally, we note that even defendant's cases in support of finding such statements improper decline to find that their inclusion rises to the level of plain error. *People v. Howell*, 358 Ill. App. 3d 512, 524 (2005); *People v. Jones*, 241 Ill. App. 3d 228, 234 (1993). Finally, defense counsel objected to the statement, and the objection was sustained. "[T]he prompt sustaining of an objection combined with a proper jury instruction usually is sufficient to cure any prejudice arising from an improper closing argument." *Johnson*, 208 Ill. 2d at 116. Accordingly, we find no error and therefore cannot find plain error.

¶ 93     The second statement in which defendant claims the prosecutor defined "beyond a reasonable doubt" occurred in the State's rebuttal, where the prosecutor stated:

> "As [defense counsel] said the burden is on us. It's a burden of reasonable doubt, that's our burden, we embrace it, we met it. And *this isn't some mystical magical burden* that's created just for Rudy Thompson, that's the burden on every case that's tried." (Emphasis added.)

Defense counsel objected, and the trial court overruled the objection. Unlike the first statement, this statement was properly preserved. However, like the first statement, we find no error here.

¶ 94     Appellate courts have found in the past that references analogous to the "mystical

magical burden" in this case are not improper. For instance, in *Carroll*, the prosecutor stated that reasonable doubt was " 'not beyond all doubt or any doubt, but beyond a reasonable doubt, a doubt that has reason behind it. That's not some mythical, unattainable standard that can't be met. That standard is met every day in courtrooms ***.' " *Carroll*, 278 Ill. App. 3d at 466. The appellate court found that the remarks were not improper. *Carroll*, 278 Ill. App. 3d at 468. Likewise, in *People v. Trass*, 136 Ill. App. 3d 455, 467 (1985), the prosecutor stated that " '[t]he defense would have you believe that it is an insurmountable burden, some mystical thing' " and that " '[i]t is a burden that is met by juries all over the country.' " The appellate court found that such statements were not error and did not minimize the State's burden of proof. *Trass*, 136 Ill. App. 3d at 467. See also *People v. Robinson*, 125 Ill. App. 3d 1077, 1081 (1984) (finding comment that " 'it is not a magical or scientific concept' " to be within the bounds of proper argument). In the case at bar, we do not find the prosecutor's reference to a "mystical magical burden" to improperly minimize the State's burden of proof and, accordingly, find no error in the State's argument on this basis.

¶ 95                              3. Implication That Defendant Stole Van

¶ 96        Defendant next argues that the prosecutor improperly implied that defendant stole the van that he was driving on the morning of the shooting when he commented during rebuttal:

> "Don't forget the defendant that night was driving in a van. No one had ever seen him with that van before. I'm not quite sure where the defendant got that van from but that's what he was driving that night."

¶ 97        "It is well established that evidence of other crimes or bad acts for which a defendant is not on trial is inadmissible against him if relevant merely to show his propensity to commit crimes." *People v. Pikes*, 2012 IL App (1st) 102274, ¶ 24. Moreover, "[e]ven when such evidence is offered for a permissible purpose and not solely for propensity, such evidence will not be admitted if its prejudicial impact substantially outweighs its probative value." *People v. Chapman*, 2012 IL 111896, ¶ 19 (citing *People v. Moss*, 205 Ill. 2d 139, 156 (2001)).

¶ 98        In the case at bar, defendant argues that the prosecutor's reference to the van was error "because it invited the jury to convict Thompson because of his questionable character, rather than his guilt for the charged offense." We cannot agree. Instead, we agree with the State that the comment made by the prosecutor during closing merely pointed out the irrelevancy of the van's ownership–an issue that was solely brought up by the defense during cross-examination when the State's witnesses were questioned about the van's ownership. We cannot find that this isolated comment in any way implied that (a) defendant stole the van he was driving and (b) the jury should convict defendant because stealing a van demonstrated defendant's questionable character. Accordingly, we cannot find that the State exceeded the bounds of proper argument.

¶ 99                                    B. Evidence of Drug Use

¶ 100      Defendant also argues that the prosecution erred by seeking the admission of evidence of defendant's marijuana use on the day of the shooting. We agree with the State that this

claim is essentially an argument that the trial court improperly admitted the evidence. Evidentiary rulings, like the one at issue here, are within the sound discretion of the trial court; and we will not reverse them on appeal unless the trial court abused its discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89. In the case at bar, we cannot find that the trial court abused its discretion by permitting evidence that defendant was smoking marijuana immediately prior to the shooting.

¶ 101     Evidence of other offenses is admissible if used for a purpose other than to demonstrate the defendant's propensity to commit crime. *People v. Rutledge*, 409 Ill. App. 3d 22, 25 (2011). "Other-crimes evidence is *** admissible if it is part of a continuing narrative of the event giving rise to the offense [citation], is intertwined with the event charged [citation], or explains an aspect of the crime charged that would otherwise be implausible [citation]." *People v. Outlaw*, 388 Ill. App. 3d 1072, 1086-87 (2009). " '[When facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes.' " *People v. Thompson*, 359 Ill. App. 3d 947, 951 (2005) (quoting *People v. Collette*, 217 Ill. App. 3d 465, 472 (1991)).

¶ 102     In the case at bar, we agree with the State that the evidence of defendant's marijuana use was admissible as part of a continuing narrative of the evening and was intertwined with the shooting. As the trial court noted, "the basis of knowledge on the part of *** the three eyewitnesses for the State[ ] is predicated on a social circumstance in which drugs were used." Additionally, the marijuana use was relevant to the issue of defendant's state of mind and to indicate why the witnesses were together and why they stopped at the food truck. We also agree with the trial court that the drug use could have "relevance both for the State and the Defense in that certainly their drug consumption in the evening or early morning hours before they witness a shooting could have probative value on their ability to observe or [on] whatever testimony they offer regarding the defendant's conduct."

¶ 103     We find defendant's reliance on *People v. Jackson*, 399 Ill. App. 3d 314 (2010), to be unpersuasive. Defendant relies on *Jackson* to argue that "unprosecuted drug use is admissible to establish motive for a charged offense only after the prosecution has demonstrated that the defendant was addicted to narcotics and that he lacked the financial resources to sustain his habit." *Jackson*, 399 Ill. App. 3d at 321. However, in *Jackson*, the State argued that the defendant's drug use established the motive for the crime in that the defendant wanted to rob the victim for drug money. *Jackson*, 399 Ill. App. 3d at 321. By contrast, in the case at bar, the State did not argue that there was such a motive but instead used the drug use to provide a narrative of the events of the evening. We cannot find that the trial court abused its discretion in permitting testimony of defendant's–and the witnesses'–drug use for this purpose.

¶ 104     We also find no merit in defendant's claim that the prosecutor's references to defendant's drug use during closing argument demonstrated that the State's sole purpose for the evidence was to paint defendant as a bad person. For instance, defendant points to the prosecutor's comment that defendant had "been up all night partying, getting high with his friends

Cornelius Jones, Chris Smith, and Cecil Barren" and the comment during rebuttal that defendant was "part of that same group" when discussing the "baggage" of the State's witnesses. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields [citation], even if such inferences reflect negatively on the defendant [citation]." *People v. Nicholas*, 218 Ill. 2d 104, 121 (2006). In the case at bar, we cannot find that any of the prosecutor's comments went beyond the bounds of proper argument.

¶ 105                                II. Gang Evidence During *Voir Dire*

¶ 106    Defendant also claims that the trial court erred when it questioned the jury concerning gang evidence during *voir dire*, despite the fact that the trial court had previously granted defendant's motion *in limine* barring such evidence. Defendant argues that he was prejudiced by the implication that he was involved with a gang, entitling him to a new trial. Defendant admits that the error was not properly preserved, but claims that trial counsel was ineffective in failing to object to the questioning, and also claims that we should relax the rules of forfeiture because the basis for the error was the trial court's conduct. Regardless of any forfeiture, we find defendant's argument unpersuasive because we cannot find that the trial court erred in asking the questions.

¶ 107    While addressing the venire, the trial court stated:

"THE COURT: There may be evidence in this case–I am talking to the 28 people I just questioned of gang membership. What I want to tell you *** is that gang membership in and of itself cannot be considered by you because he or she is in a gang, that they are guilty of a crime.

Does everybody understand that?

PROSPECTIVE JURORS: Yes.

THE COURT: It is just a part of the evidence, but it is not the thing that should make you make your decision. It is another thing to consider along with all the other evidence in this case in reaching your verdict.

Would everyone follow that law in this case?

PROSPECTIVE JURORS: Yes.

THE COURT: Anyone take issue with it?

No one is indicating.

Understand it is something that you can consider, but it is not a reason to say in and of itself, in other words, just [because] he sat down and said I am in the Insane Pastry Cooks, right, that is not enough in and of itself to convict a person.

Does everybody understand that?

PROSPECTIVE JURORS: Yes.

THE COURT: You have to listen to the evidence and decide the case by the evidence."

¶ 108    "[T]he trial court is given the primary responsibility of conducting the *voir dire* examination, and the extent and scope of the examination rests within its discretion." *People*

*v. Strain*, 194 Ill. 2d 467, 476 (2000). "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those venirepersons whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath. [Citation.] Only when the trial court's actions have frustrated the purpose of *voir dire* will an abuse of discretion be found. [Citation.]" *People v. Hope*, 168 Ill. 2d 1, 30 (1995).

¶ 109    Here, the actions of the trial court may have protected defendant against bias for gang involvement. In the case at bar, contrary to defendant's contention, the trial court did not simply grant defendant's motion *in limine* outright. Instead, the trial court granted the defense's motion concerning gang affiliation "as it relates basically to the State's case in chief," but indicated that "depending on the evidence as it is adduced it is possible that this Court will allow certain gang evidence to come in should I deem it relevant at a later time either by way of explanation of a change of testimony by one of the witnesses or any other unforeseen circumstance that might occur. I will deal with it on a case by case question by question basis." Thus, the court's ruling left open the possibility of gang evidence becoming admissible at some point in the trial. As defendant points out, "street gangs are regarded with considerable disfavor by other segments of our society." *Strain*, 194 Ill. 2d at 477. Accordingly, "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant *must* be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." (Emphasis added.) *Strain*, 194 Ill. 2d at 477.

¶ 110    In the case at bar, as noted, while gang evidence was not expected to be an integral part of the trial, the possibility of gang evidence becoming admissible was left open. We cannot fault the trial court for being cautious in conducting *voir dire* and addressing the possibility in its questioning of the venire. We also note that this was the only reference to gangs throughout the trial; it did not become an issue, nor was the jury instructed about gang evidence at the end of the trial. Consequently, we cannot agree with defendant that this comment by the trial court prejudiced defendant. See *People v. Jackson*, 205 Ill. 2d 247, 282 (2001) (finding no reasonable probability that the defendant was prejudiced as a result of *voir dire* questioning "which occurred long before the jury ever heard any evidence or determined whether defendant was eligible for the death penalty," thereby rendering the defendant unable to satisfy the cause-and-prejudice test). Finally, in response to the trial court's statements, the venirepeople affirmatively indicated that they would follow the law and not use evidence of gang membership as proof of guilt.

¶ 111    We find defendant's use of *People v. Limon*, 405 Ill. App. 3d 770 (2010), to be inapposite. Defendant uses *Limon* to argue that the motion *in limine* should have been "unequivocally excluded" because "at no point would gang affiliation magically become relevant or admissible." However, defendant raises this issue for the first time in his reply brief, in response to the State's comment that the motion *in limine* did not bar all gang evidence. Moreover, the issue of gang evidence did not arise during trial and we will not speculate as to whether it would have been admissible had it been before the trial court. Accordingly, we find no error in the trial court's comment during *voir dire*.

¶ 112                                III. Sentencing

¶ 113    Finally, defendant raises two arguments concerning his sentence. He first asks us to reduce his sentence because the 25-years-to-natural-life mandatory firearm enhancement is unconstitutionally vague. Alternatively, he asks us to remand for resentencing because the trial court improperly bifurcated defendant's sentence instead of considering the enhanced range, resulting in an excessive sentence.

¶ 114                     A. Constitutionality of Firearm Enhancement

¶ 115    Defendant first argues that the 25-to-life mandatory firearm enhancement is unconstitutionally vague because it provides no objective criteria for a trial court to apply in determining where within the statutory range the enhancement should fall. In other words, the statute does not provide guidance for determining whether a defendant should receive an enhancement of 25 years, natural life, or somewhere in between.

¶ 116    "All statutes carry a strong presumption of constitutionality," and in order to overcome the presumption, "the party challenging the statute must clearly establish that it violates the constitution." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). "If reasonably possible, a statute must be construed so as to affirm its constitutionality and validity." *People v. Greco*, 204 Ill. 2d 400, 406 (2003). The constitutionality of a statute is "a pure question of law," and thus, our standard of review is *de novo*. *People v. Jones*, 223 Ill. 2d 569, 596 (2006). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 117    "A vagueness challenge is a due process challenge, examining whether a statute ' "give[s] [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." ' " *Greco*, 204 Ill. 2d at 415 (quoting *Russell v. Department of Natural Resources*, 183 Ill. 2d 434, 442 (1998), quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). In considering a vagueness challenge, a court looks to the legislative objective and the evil the statute is designed to remedy, in addition to the language of the statute. *Greco*, 204 Ill. 2d at 416. "[D]ue process is satisfied if: (1) the statute's prohibitions are sufficiently definite, when measured by common understanding and practices, to give a person of ordinary intelligence fair warning as to what conduct is prohibited, and (2) the statute provides sufficiently definite standards for law enforcement officers and triers of fact that its application does not depend merely on their private conceptions." *Greco*, 204 Ill. 2d at 416 (citing *People v. Falbe*, 189 Ill. 2d 635, 640 (2000)). In the case at bar, defendant makes a vagueness challenge based on the second ground: he claims that the 25-to-life enhancement does not provide sufficiently definite standards for courts such that the application of the enhancement depends on the court's private conceptions.

¶ 118    Section 5-8-1 of the Unified Code of Corrections provides that the sentence for first degree murder is 20 to 60 years, but further provides that "if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the

-22-

court." 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002). Defendant argues that the lack of standards in the 25-to-life enhancement render the statute unconstitutionally vague, both on its face and as applied to him. We do not find defendant's argument persuasive.

¶ 119    Although not cited by either party, we have recently decided this very question in *People v. Butler*, 2013 IL App (1st) 120923, *appeal denied*, No. 116420 (Sept. 25, 2013). In *Butler*, the defendant was convicted of first degree murder and was sentenced to 50 years in the Illinois Department of Corrections and an additional 30 years as a mandatory firearm enhancement for personally discharging a firearm that proximately caused the victim's death. *Butler*, 2013 IL App (1st) 120923, ¶¶ 3-4. On appeal, the defendant argued, *inter alia*, that the 25-to-life firearm sentence enhancement was unconstitutionally vague on its face and as applied to him. *Butler*, 2013 IL App (1st) 120923, ¶ 35. "Specifically, Butler argue[d] that the statute is unconstitutionally vague because the broad sentencing range fails to appropriately guide judges, and encourages arbitrary and discriminatory sentencing based entirely on opinions and whims. Butler contend[ed] that the statute does not provide objective criteria as to where within the 25-years-to-life range a sentence should fall." *Butler*, 2013 IL App (1st) 120923, ¶ 35.

¶ 120    On appeal, we found that the firearm enhancement was not unconstitutionally vague. We noted that, although the enhancement allows a wide range of sentences, there is a clear and definite scope of the sentencing range–the enhancement must be no less than 25 years and up to a term of natural life–and the trial court has no discretion as to whether to apply the enhancement. *Butler*, 2013 IL App (1st) 120923, ¶ 41. We also determined that the standards for imposing the enhancement are clearly defined: it must be applied when a defendant commits first degree murder and discharges a firearm that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death. *Butler*, 2013 IL App (1st) 120923, ¶ 41. We noted:

> "Depending on the injury caused by the firearm used by the defendant, the trial court has the discretion to impose a sentence in the range of 25-years-to-life. This allows the trial court to engage in fact-based determinations based on the unique circumstances of each case. The wide range of the sentence enhancement is appropriate because it is impossible to predict every type of situation that may fall under the purview of the statute. By defining the types of injuries that trigger the sentence enhancement, the legislature has provided the trier of fact with guidelines to apply when determining what sentence to impose within the boundaries of the statute. Therefore, the scope and standards of the 25-years-to-life sentence enhancement are not vague." *Butler*, 2013 IL App (1st) 120923, ¶ 41.

We pointed out that "there are countless conceivable situations" in which a firearm causes an injury, but some other action causes the death of the victim and that "[s]uch a situation would be wholly distinguishable" from a situation in which the firearm caused the victim's death. *Butler*, 2013 IL App (1st) 120923, ¶ 42. "In both cases the sentence enhancement would apply, but the trial court could impose a different sentence within the statutory range for each situation." *Butler*, 2013 IL App (1st) 120923, ¶ 42. Although we acknowledged that "confusion could be avoided if the legislature provided more explicit guidance regarding the imposition of the 25-years-to-life sentence enhancement," we concluded that the statute was

not unconstitutionally vague. *Butler*, 2013 IL App (1st) 120923, ¶ 42.

¶ 121    We find the reasoning of our recent *Butler* decision to be persuasive, and follow it to conclude that the 25-to-life firearm enhancement is not unconstitutionally vague.

¶ 122                                    B. Bifurcation of Sentence

¶ 123    In the alternative, defendant asks us to remand his case for resentencing because the trial court improperly bifurcated the sentence into two distinct sentences, instead of imposing one sentence incorporating the enhancement. Defendant did not raise this issue in his motion to reconsider his sentence, and does not ask us to review the claim for plain error. Therefore, we agree with the State that this claim has been forfeited and do not consider it. See *People v. Reed*, 177 Ill. 2d 389, 395 (1997) (affirming the appellate court where the defendants had forfeited their contentions of error by failing to raise the issues in a post-sentencing motion and noting that the defendants did not argue that their sentencing challenges amounted to plain error).

¶ 124    However, although not raised by the parties, our review of the record on appeal reveals that the mittimus in defendant's case is incorrect. There is no dispute that, at the sentencing hearing, the trial court sentenced defendant to 50 years in the Illinois Department of Corrections for first degree murder and sentenced defendant to an additional 40 years pursuant to the mandatory 25-to-life firearm enhancement. However, the mittimus reflects two sentences for first degree murder: 50 years for first degree murder for acting with intent to kill or do great bodily harm (720 ILCS 5/9-1(a)(1) (West 2002)), and 40 years for first degree murder for acting with knowledge that the acts create a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2002)). Furthermore, the mittimus does not reflect the sentence for the mandatory firearm enhancement required under section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002)). "Where the sentence indicated in the common law record conflicts with the sentence imposed by the trial judge as indicated in the report of proceedings, the report of proceedings will prevail and the common law record must be corrected." *People v. Peeples*, 155 Ill. 2d 422, 496 (1993). Accordingly, we order the mittimus to be corrected to reflect one count of first degree murder, for which defendant was sentenced to 50 years, and the 40-year firearm enhancement for personally discharging the firearm that proximately caused the victim's death. See *Peeples*, 155 Ill. 2d 422; Ill. S. Ct. R. 615(b)(1). In all other respects, we affirm the judgment of the trial court.

¶ 125                                    CONCLUSION

¶ 126    We affirm the judgment of the trial court where (1) the State's closing argument was proper, (2) the trial court's questioning of the jury during *voir dire* was proper, and (3) defendant's enhanced sentence was not unconstitutional. However, we order the mittimus to be corrected to reflect one count of first degree murder, for which defendant was sentenced to 50 years, and the 40-year firearm enhancement for personally discharging the firearm that proximately caused the victim's death.

¶ 127    Affirmed.