2020 IL App (1st) 172382-U

THIRD DIVISION
March 4, 2020

No. 1-17-2382

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 18823 |
| | ) | |
| DEANDRE JACKSON, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Ellis and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) The State proved defendant guilty beyond a reasonable doubt; (2) defense attorneys were not ineffective for not requesting the jury instruction defining a firearm; (3) the trial court did not abuse its discretion in denying defendant's motion for a mistrial; (4) defendant was not denied a fair trial where the prosecutors' arguments were not improper; and (5) no cumulative error occurred to warrant a new trial.

¶ 2    Defendant Deandre Jackson was indicted for the September 22, 2015 armed robbery of

Rafael Pearson and the September 23, 2015 armed robbery of Kenyo Barrera and Cecilia Wen.

The cases were joined for trial. Following the jury trial, defendant was found guilty of the armed

robbery against Pearson, but acquitted in the armed robbery of Barrera and Wen. The trial court subsequently sentenced defendant to a term of 22 years in prison.

¶ 3    Defendant appeals, arguing that (1) the State failed to prove defendant guilty of armed robbery beyond a reasonable doubt because the State failed to prove he was armed with a firearm; (2) his trial counsel was ineffective for failing to request a jury instruction defining the term "firearm"; (3) he was denied a fair trial when the State introduced irrelevant evidence of defendant's prior arrest record; (4) he was denied a fair trial based on the improper comments made by the prosecutor during rebuttal closing argument; and (5) the cumulative effect of these errors warrants a new trial.

¶ 4    Defendant was charged by indictment with three counts of armed robbery with one count against each of the three victims. The cases were joined without objection. The following evidence was presented at defendant's jury trial. While defendant was acquitted of the armed robbery of Barrera and Wen, we include the evidence presented relating to those offenses to present a complete portrayal of the trial including the police investigations of both crimes.

¶ 5    Pearson testified that on September 22, 2015, he was at his sister's house in the 4400 block of South Indiana Avenue in Chicago. His car was parked in front of the house. At around 10:30 p.m., he left to meet friends and noticed that his front left tire was flat. Pearson attached an air pump that is powered from the lighter in his car to put air in his tire. The car was on with the door open and a window down while the pump was connected inside the car. Pearson described the block as residential with "nice lighting" along the block.

¶ 6    When Pearson was checking his tire, he noticed two men walking down the street wearing hoodie sweatshirts with the hoods up tight around their faces. The faces of the men were visible, but their hair and necks were not. Pearson went to sit in his car and the men approached

him. He had tried to hurry, but he was standing in "a tight spot." When the men got within ten feet of him, one of the men pulled out a firearm and said, "give me your s***." Pearson identified the armed man in court as defendant.

¶ 7     Pearson testified that he saw the firearm and described it as "shiny" from the streetlights and black near the handle. He stated that he had seen guns before and was familiar with guns. He testified that he "really didn't get that good of a look," but he knew "it wasn't a revolver because it was slicked down. It wasn't like the little rolling pin." He was "kind of a little bit" familiar with semiautomatic firearms. Pearson observed the black part of the gun because defendant had the gun to Pearson's face and Pearson "looked down and saw the black with the handle." Defendant was standing next to Pearson with the firearm on the left side of Pearson's face.

¶ 8     Pearson put up his hands until defendant told Pearson to reach for his belongings in the car. Pearson picked up his Kindle Fire from the passenger seat and defendant took it. Defendant also told Pearson to remove his keys from the ignition and defendant took the keys. The second man reached into Pearson's left pocket and took his wallet. Defendant went into Pearson's right pocket and took Pearson's LG cell phone. Defendant reached for the middle console in the car and took two watches from inside the console. Defendant continued to hold a firearm throughout the encounter. Pearson was able to see defendant's face the entire time.

¶ 9     When the men got everything they wanted, they ran in the same direction from which they approached Pearson. Defendant turned back towards Pearson and said, "Your b**** a**," as he put the firearm away. Pearson described the second offender as having a lighter skin tone than defendant, but he did not see this man's face. Pearson had never seen defendant or the second man before that moment. He did not give the men permission to take his belongings. Pearson thought about chasing them, but realized that would be "stupid" because they had a

firearm. He went into his sister's house and called the police. Pearson estimated that the robbery took place quickly, in a matter of seconds.

¶ 10    On October 16, 2015, Pearson met with Detective Luis Otero at Pearson's sister's house. Pearson signed a photo advisory form and declined to be recorded during his viewing of the photo array. Pearson identified the photo array in court that he viewed. Pearson identified defendant in the photo array. Pearson also identified his LG phone and Kindle Fire in a photograph exhibit after the items were recovered by the police. He testified that the Kindle Fire was registered to him and when turned on, it would say, "Rafael's Kindle" and his Facebook profile was also visible.

¶ 11    Kenyo Barrera and Cecilia Wen each testified that in September 2015, they were students at the Illinois Institute of Technology (IIT) in Chicago. On September 23, 2015, Barrera was living in Bridgeport, near South Princeton Avenue and East 31st Street, which was about five blocks from IIT. Shortly after 4 a.m., they were walking from the library at IIT to his apartment. They had spent the night studying and doing homework. They had their school supplies with them. Barrera had his scientific calculator, laptop, and notes in his The North Face book bag. He also had his cell phone and wallet in his pockets. Wen had her laptop, phone, and wallet in a crossbody messenger bag. Barrera was carrying a skateboard and Wen had a bicycle, but they were not riding either because they were too tired.

¶ 12    At around 4:30 a.m., they were walking in the street on the west side of the street near East 31st Street and South Wells Street. Barrera testified that there was no one outside. The area is residential with a gas station at one corner. He described the street as "lit" with light posts on both sides of the street. He observed people at the far end of the street, but he did not think about it. The people were further north of them. As they approached the corner, the people split up with

one crossing the street to the east and going up ahead of them. The other two individuals were "walking basically right in front of us on the sidewalk." The three men were wearing hoodie sweatshirts with the hoods up. Their faces were visible.

¶ 13    At some point, the person that crossed the street came up behind Barrera and held a gun to the back of Barrera's head. Barrera described the firearm as black with "some kind of attachment on the top part of the gun *** like a laser." Of the two other men, one approached Barrera and the other approached Wen. According to Barrera, one of the men said to be quiet and "just be cool and not to do anything stupid." Barrera identified defendant in court as the man who put a gun to the back of his head. Wen initially did not realize what was happening and continued walking about ten feet ahead of Barrera. She turned back and saw two men with Barrera. She noticed that one man had approached her and he put his hand on her shoulder. Wen testified that she "pivoted around" in an effort to keep the man from touching her. She initially was able to see what was happening to Barrera. Then the second time she looked back, she saw a red laser pointed at her face when she looked at Barrera and was unable to see what was going on. She testified that the man by her did not know how to open her bag, but he was eventually able to open the bag and took her laptop. The man did not take her wallet or cell phone.

¶ 14    Defendant instructed the third man to search Barrera's pockets and the man took Barrera's cell phone and wallet. The men also took Barrera's backpack. The men then left going south toward 32nd Street. Barrera saw the lights of a car, but did not see the men enter a car. They then called 911.

¶ 15    On September 29, 2015, Barrera met with Detective David Matual in the IIT library. Barrera signed a photo advisory form, but declined to be recorded. He then viewed a photo array and identified defendant. Wen separately viewed a photo array, but she was unable to identify

anyone. They later received their laptops and Barrera received his book bag back from the police. Barrera's phone and wallet were not returned.

¶ 16    Officer Paul Gentile testified that he was employed as a police officer with the Chicago Police Department and assigned to the 7th district mission team. His team was assigned on a daily or weekly basis to a high crime area. He performs similar functions as a patrol officer, but the officers drove unmarked vehicles and dressed in plain clothes.

¶ 17    On September 23, 2015, he was working with two partners, Officer Matthew Breen and Officer Demus.[1] The officers were in plain clothes and Officer Breen was driving an unmarked car. At approximately 6:25 p.m., Officer Breen observed a vehicle commit a traffic violation and the officers proceeded to conduct a traffic stop. During the stop, the officers' vehicle was parked directly behind the stopped vehicle near 7051 South Vincennes Avenue in Chicago. Officers Breen and Demus approached the vehicle for the traffic stop while Officer Gentile remained in the front passenger seat of the police car with the door open to run the license plate of the stopped car.

¶ 18    As he was checking the plate, he noticed an unrelated vehicle parked beside him. The vehicle was running, but no one was in the driver's seat. He described the vehicle as a champagne gold Lexus SUV. He observed an individual in the passenger seat and identified defendant in court as the passenger in the SUV. Officer Gentile testified that as he was looking at the vehicle, defendant looked up and looked into his eyes, and then "his eyes got wide and he quickly put his head down like he was hiding something." Officer Gentile then ran the license plate of the Lexus SUV, which was "Adam 734417," and the result indicated that the vehicle was stolen. He turned his head to that vehicle and the passenger door was "slamming" as defendant

---

[1] Officer Demus's first name does not appear in the record.

ran away from the vehicle. Officer Gentile immediately gave chase and caught defendant approximately 15 feet from the vehicle. Defendant was then placed under arrest. At the time of defendant's arrest, no weapon was found on him or in the vehicle. Officer Gentile testified that at the time he was unaware of the robberies that had occurred in the past 24 hours near 3131 South Wells or 4442 South Indiana. He did not know the names of Pearson, Barrera, or Wen.

¶ 19     Defendant was taken to the 7th district police station for processing and was arrested for criminal trespass to vehicle. Officer Breen processed defendant at the station. Officer Gentile learned that defendant initially gave Officer Breen a name that revealed no record and later he gave Officer Breen his real name. Officer Gentile drove the SUV to the district. When he entered the SUV, he saw electronics on the floor. He observed a Kindle tablet on the floorboard of the passenger seat where defendant had been sitting. The vehicle also had multiple cell phones, identification not belonging to defendant, two laptops, jewelry, and watches. He found an LG phone in the center cup holder. In the back of the SUV, he located a gray laptop and a The North Face backpack containing a black laptop. The owner of the SUV confirmed that these items were not in her vehicle when it was taken. The items were then inventoried with unique numbers into the police system.

¶ 20     Officer Matthew Breen testified that he was working with Officer Gentile on September 23, 2015. He was performing a traffic stop at 7051 South Vincennes and did not realize Officer Gentile had someone in custody until Officer Gentile yelled for his attention. Later, he processed defendant after defendant was brought to the police station. While he was processing defendant, defendant told the officer that his name was Deonte Ellis with a date of birth of April 30, 1998, and he lived on Drexel Boulevard. Officer Breen went to check this information on the computer and it returned no results. He returned to defendant and "asked him again what his real name and

date of birth was. That if he had been arrested before that his name and date of birth would come up in the system." At this point, defendant's attorney objected and the trial court sustained the objection, instructing the jury to "disregard that last question[/]answer." A sidebar discussion then occurred off the record. When the direct examination resumed, Officer Breen testified that defendant gave the name of Deandre Jackson with a date of birth of January 26, 1995, and he lived on the 4600 block of South Ellis. At that time, Officer Breen was unaware of the armed robberies that occurred at 31st and Wells and near 44th and Indiana.

¶ 21   Following Officer Breen's testimony, defendant moved for a mistrial based on the officer's testimony that if defendant gave his real name, "it would pop up in the system." The trial court denied the motion for a mistrial and noted that Officer Breen "wasn't asked and didn't say that he found him in the data base under Deandre Jackson. Just that he didn't believe his name was Deonte Ellis. He asked him for a different name."

¶ 22   Detective Antonio Corral testified that he was assigned to investigate robberies in the 9th district of the Chicago Police Department and on September 24, 2015, he was assigned to investigate the Barrera and Wen armed robberies. He was not assigned to investigate the Pearson armed robbery. When he received the assignment, he was not aware of defendant's arrest on September 23, 2015. He met with Barrera and Wen near the location of the robbery to discuss how the robbery occurred. He then canvassed the area between 31st and 33rd on Wells to find out if there were additional witnesses or video from the residences there. He was able to locate multiple residential videos showing Barrera, Wen, the three suspects, and a gold Lexus. The recordings showed the gold Lexus drive past Barrera and Wen as they walked along Wells Street and circle the area where they were robbed. The videos also showed the three suspects get into the gold Lexus after the robbery and head west on 32nd Street.

¶ 23    The videos also disclosed the license plate of the Lexus to be A734417. Detective Corral then searched the license plate and learned it had been reported stolen. He then checked the reference number associated with the recovery of that vehicle and learned that a person had been arrested and various items had been inventoried. Detective Corral learned this information on September 29, 2015. He found out defendant was the person arrested in the Lexus.

¶ 24    Detective Corral did not arrest defendant for the Barrera and Wen armed robberies because "there wasn't sufficient enough information to make an arrest." He proceeded to identify recovered items including a The North Face backpack and two laptops. He also looked at other items that had been recovered but they were not proceeds from the Barrera and Wen robbery. He looked at the Kindle, turned it on, and it displayed the named Rafael Pearson. He then ran a search for a victim with that name. At that point, he learned about another armed robbery and that another detective, Detective Raymond Verta, had been assigned to that case. Detective Corral made contact with Detective Verta and informed him that his victim's Kindle had been recovered at the same location as items from the robbery he was investigating.

¶ 25    Detective Corral then prepared a photo array with defendant's picture included. He did not administer the photo array to Barrera or Wen, he was required to obtain an independent administrator who was not assigned to the case. Detective Matual was the independent administrator for this photo array. Both detectives went to IIT to meet with Barrera and Wen. He was not present when Barrera viewed the photo array. He was outside of the room with Wen. He did not tell either of them who to identify in the photo array. He did not tell Detective Matual who the suspect was in the photo array. Detective Corral never had any contact with Pearson. Detective Matual gave testimony that corroborated Detective Corral's testimony regarding Barrera's identification in a photo array. He confirmed that he did not create the photo array and

was not involved in the investigation of the case.

¶ 26    Detective Raymond Verta testified that he was employed as a detective with the Chicago Police Department and was assigned to investigate robberies in the 2nd district. In September 2015, he was assigned to investigate the armed robbery of Pearson. He first tried to contact Pearson, but was unable to reach him. He also went to his address and learned that Pearson no longer resided at that location. Since he was unable to contact Pearson, Detective Verta placed the case in a suspended status until he was able to reach the victim. He was unaware of the Barrera and Wen armed robberies as well as defendant's arrest.

¶ 27    In October 2015, Detective Verta was contacted by Detective Corral and learned that some of Pearson's property had been in defendant's possession at the time of his arrest. Detective Verta identified defendant in court. The detective then assembled a photo array. He also was able to contact Pearson. On October 16, 2015, he met Pearson. The detective had Detective Luis Otero administer the photo array as an independent administrator. Detective Otero corroborated Detective Verta's testimony regarding Pearson's viewing of the photo array. Detective Otero was not involved in the investigation and did not prepare the photo array.

¶ 28    The State then rested. Defendant moved for a directed verdict, which the trial court denied. Defendant rested his case without presenting any witnesses. Following closing arguments, the jury found defendant guilty of the armed robbery of Pearson and not guilty in the armed robbery of Barrera and Wen. The trial court subsequently sentenced defendant to a term of 22 years in prison.

¶ 29    This appeal followed.

¶ 30    Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt because the evidence was insufficient to establish that defendant was armed with a firearm. The

State maintains that Pearson's testimony provides ample support for the jury's verdict.

¶ 31    When this court considers a challenge to a criminal conviction based upon the sufficiency of the evidence, it is not our function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); accord *People v. Cox*, 195 Ill. 2d 378, 387 (2001). It is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). "Accordingly, a jury's findings concerning credibility are entitled to great weight." *Id*.

¶ 32    The reviewing court must carefully examine the record evidence while bearing in mind that it was the fact finder who observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Id*. Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

¶ 33    To prove defendant guilty of armed robbery, the State was required to establish beyond a reasonable doubt that he took "property *** from the person or presence of another by the use of force or by threatening imminent use of force" (720 ILCS 5/18-1(a) (West 2014)) and that he

"carrie[d] on or about his *** person or [was] otherwise armed with a firearm" (720 ILCS 5/18-2(a)(2) (West 2014)). For purposes of this statute, a firearm, in relevant part, is defined in section 1.1 of the Firearm Owners Identification Card Act (FOID Act) as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas" but specifically excluding, among other items, any pneumatic gun, spring gun, paint ball gun, or BB gun. 430 ILCS 65/1.1 (West 2014); 720 ILCS 5/2-7.5 (West 2014). "[C]ourts have consistently held that eyewitness testimony that the offender possessed a firearm, combined with circumstances under which the witness was able to view the weapon, is sufficient to allow a reasonable inference that the weapon was actually a firearm." *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 15. "Consequently, the State need not present a firearm in order for the trier of fact to find the defendant possessed one." *Id.* See also *People v. Wright*, 2017 IL 119561, ¶¶ 76-77; *People v. Washington*, 2012 IL 107993, ¶ 36.

¶ 34    Here, Pearson testified that he observed defendant approach with a firearm in his hand and then place the firearm to Pearson's head. He stated that he had seen guns before and was familiar with guns. While he said that he "really didn't get that good of a look," he knew "it wasn't a revolver because it was slicked down. It wasn't like the little rolling pin." He was "kind of a little bit" familiar with semiautomatic firearms. He described the handle as black. He also observed the firearm as defendant fled and put the firearm away on his person. Pearson further testified that the area was well lit and he was able to see the firearm. Pearson maintained in his testimony that he "definitely" saw a firearm.

¶ 35    Defendant asserts that Pearson gave a "vague and general description of the object" and "there was no evidence from which an inference could be drawn that the object had the design of a firearm." The State responds that Pearson's testimony established that he was familiar with

firearms, the robbery was committed in a well lit location, and defendant had sufficient time to observe the firearm, including while it was put to Pearson's head.

¶ 36    The Illinois Supreme Court has addressed the issue of the sufficiency of the evidence from which a trier of fact may infer that an object used in a crime was a gun or firearm in multiple cases. In *People v. Ross*, 229 Ill. 2d 255, 273-76 (2008), the supreme court rejected a presumption that an object appearing to be a gun is a loaded and operable gun, instead finding that a trier of fact may infer from trial evidence that an object was a dangerous weapon. In *People v. Washington*, 2012 IL 107993, ¶ 36, the court found that a victim's unimpeached testimony may be sufficient evidence that a defendant was armed with a gun during his offense. Given the victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun." *Id*. The *Washington* court affirmed a conviction for armed robbery when the victim had a clear view of the object pointed at him and testified that it was a gun, when no firearm was recovered and when the defense argued insufficient evidence of a gun or firearm from the absence of a recovered object. *Id*. ¶¶ 10-11, 15-18, 34-37.

¶ 37    Most recently, the supreme court considered this issue in *Wright*, 2017 IL 119561. There, the court reviewed whether its rationale in *Washington*, involving a version of the armed robbery statute referring to a "dangerous weapon," applied to the present statute concerning a "firearm." *Id*. ¶ 76. The court concluded that "the same rationale" in *Washington* controlled. The court then found that the witnesses' testimony was sufficient for a rational trier of fact to conclude that the defendant was armed with a firearm. *Id*. ¶ 77. The witness testified that the "codefendant told him 'this is a robbery' and lifted his hoodie to reveal what 'looked like a black automatic, black gun.' " *Id*. ¶ 76. The witness believed it was a semiautomatic and testified that he had experience

firing such guns. *Id*. The witness further testified that he " 'felt something sharp in [his] back,' which felt like the barrel of a gun." *Id*. The witness also testified about the color of the gun and explained that he had experience firing the exact type of gun he believed was used. *Id*. The witness testified that he was " '100% sure' " that the weapon was "an 'actual firearm.' " *Id*. Another witness testified that "he had seen guns before and believed codefendant's gun was a '9 millimeter pistol.' " *Id*.

¶ 38     The State argues that this case is analogous to the supreme court's decision in *Wright*, but defendant contends that the facts of this case are distinguishable from *Wright*. We agree with the State. Pearson first observed the gun when defendant approached him, pulled out a gun, and said for Pearson to "give me your s***." Pearson testified that he was familiar with, and had viewed guns before, and was "kind of a little bit" familiar with semiautomatic firearms. Pearson described the gun "slicked down" and he knew it was not a revolver because it did not have the "little rolling pin." He saw black "probably where the handle was" and it was shiny. The gun was then pressed to his face during the robbery. Pearson testified that he "definitely" saw a gun under the bright light from the streetlight. Pearson also saw the gun when defendant was fleeing and he "was looking back as he was putting the gun back in his pants." Based on *Washington* and *Wright*, we find that a trier of fact could reasonably infer from such evidence that the object at issue was a firearm.

¶ 39     We find defendant's reliance on *People v. McLaurin*, 2018 IL App (1st) 170258, *appeal allowed*, No. 124563, to be misplaced. In *McLaurin*, the defendant was charged with being an armed habitual criminal, which required the State to prove he possessed a firearm within the meaning of the FOID Card Act. *Id*. ¶¶ 20-21. The reviewing court reversed the defendant's conviction because the conviction was based solely on a police officer's testimony that she

observed the defendant walking on the street holding what appeared to be a gun in his hand from 50 feet away. *Id*. ¶ 26. The officer was unable to provide any description other than the color. *Id*.

¶ 40    Moreover, in its analysis, the majority in *McLaurin* specifically distinguished armed robbery cases on the ground that "the underlying offense is robbery" and, to prove robbery, "there is no requirement to prove that a firearm was used in the taking." *Id*. ¶ 24. The majority found that the "[u]se of a firearm during the course of a robbery is an aggravating factor that if proven, increases the severity of the crime and elevates the penalty." *Id*. Accordingly, the majority concluded that "circumstantial evidence may be used to create an inference that a firearm was used in the course of the robbery sufficient to establish the aggravating factor to support the more serious offense of robbery while armed with a firearm." *Id*. "Armed robbery cases usually involve the offender pointing a gun, and ordering the victim to relinquish money and valuables. There is a threat that if the victim does not comply, the defendant will shoot the victim." *Id*. However, the majority reasoned that was "not the case with possessory firearm offenses where the item possessed cannot be inferred from circumstantial evidence but must be proven beyond a reasonable doubt to be a firearm as defined by the statute." *Id*.

¶ 41    Regardless of this difference, Pearson's testimony was more akin to the witness testimony in *Wright* than that offered in *McLaurin*. As discussed above, Pearson observed the firearm as defendant approached through defendant's flight, including while it was pressed to Pearson's head during the robbery. After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have found that defendant was armed with a firearm during the robbery.

¶ 42    Next, defendant contends that his trial counsel was ineffective for failing to request the jury instruction defining the term "firearm." The State responds that defendant cannot establish

15

ineffective assistance of counsel because his trial counsel's strategy was to argue that defendant was innocent based on mistaken identity and counsel did not advance a strategy that he was guilty of the lesser offense of robbery.

¶ 43    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001).

¶ 44    "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "In recognition of the variety of factors that go into any determination of trial strategy, courts have held that such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *Id.* at 330-31 (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), and *Strickland*, 466 U.S. at 689).

¶ 45    In evaluating prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of

sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id.* at 697.

¶ 46　Defendant asserts that both prongs have been satisfied in this case because there was "no conceivable strategic basis for foregoing" the firearm instruction and the omission was prejudicial since there was no evidence the object used had the attributes of a firearm. In the Illinois Pattern Jury Instructions, Criminal, No. 18.35G (4th ed. 2000) (hereinafter IPI Criminal 4th), the word " 'firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas." Defendant acknowledged that the jury instructions for armed robbery do not require that the firearm definition be given as well. See Illinois Pattern Jury Instructions, Criminal, Nos. 14.05, 14.06 (approved Jan. 24, 2014) (hereinafter IPI Criminal Nos. 14.05, 14.06).

¶ 47　" 'Defense counsel's choice of jury instruction is considered a tactical decision, within the discretion of defense counsel.' " *People v. Mims*, 403 Ill. App. 3d 884, 890 (2010) (quoting *People v. Bobo*, 375 Ill. App. 3d 966, 977 (2007)). Defendant contends that it was his trial counsel's responsibility to submit instructions " 'that fully apprised the jury of her client's defense.' " *People v. Getter*, 2015 IL App (1st) 121307, ¶ 73. In *Getter*, the defendant was charged with first degree murder, attempted murder, aggravated battery with a firearm, and aggravated discharge of a firearm. At trial, the defendant did not deny firing the weapon, but asserted that he acted in self-defense. *Id*. ¶¶ 1-2. The jury received self-defense instructions for three of the four offenses and he was acquitted on those charges, but the fourth offense, aggravated discharge of a firearm, no self-defense instruction was offered and the jury convicted the defendant. *Id*. ¶ 2. On appeal, the reviewing court found the trial counsel's performance to be objectively unreasonable when counsel had argued during closing argument about the justified

use of force and further argued that the jury "would be receiving an instruction 'about when someone is justified in the use of force.' " *Id.* ¶ 73. But the attorney later acquiesced to the State's proposed instruction for aggravated discharge of a firearm, "which erroneously excluded the proposition that the State must prove the absence self-defense beyond a reasonable doubt." *Id.* The court reasoned, "Either counsel believed that self-defense did not apply to aggravated discharge of a firearm, which is inaccurate, or counsel did not adequately review the instructions. In either case, counsel did not attempt to provide the jury with the necessary tools to evaluate her client's defense." *Id.* ¶ 75.

¶ 48    However, in the present case, the defense presented to the jury was mistaken identity. Defendant's trial attorneys raised this defense throughout trial, beginning with the opening statement and through the closing argument. Counsel never asserted that the State failed to prove that defendant possessed a firearm. Counsel did not argue that defendant committed simple robbery. During opening statements, one of defendant's attorneys stated:

> "Now, this isn't a conspiracy. No one is out to get him. But people are human beings. People make mistakes. And they made a mistake in this case when they said that Mr. Jackson was the individual who perpetrated these crimes. Mr. Jackson is innocent. We're going to ask you to find him not guilty."

¶ 49    At the end of the trial, defendant's other trial counsel reiterated that the case was "about mistaken identity." Counsel argued that the descriptions of the offender given by Barrera and Wen were inconsistent and did not describe defendant and that both were tired from studying all night. Counsel told the jury that they would receive an instruction about how to weigh identification testimony and then discussed Pearson's opportunity to view the offenders. The extent of argument regarding a firearm focused on the fact that no firearm was recovered and

was related to the mistaken identity defense.

"The state wants you to believe that because of this gold Lexus Deandre is

guilty. That's what this is about. He was in a stolen car on the south side of

Chicago. He ran from the stolen car. There was proceeds into it -- there is no gun.

And we are talking about two different guns here. Rafael told you there

was a black gun, not a revolver. Cecilia and Kenyo told you there was a black gun

with a laser on it that it actually had something on top.

There is no gun recovered in this case. There is no gun that they found on

Deandre Jackson. There is no testimony that they went and searched his house

and recovered a weapon. There is no testimony about a gun being recovered that

is attached to Deandre Jackson."

Counsel concluded by asking the jury to find defendant not guilty of all charges.

¶ 50    We disagree with defendant's assertion that the firearm instruction was "compatible" with the defense presented at trial. The jury was not instructed about finding defendant guilty of the lesser offense of robbery and no verdict forms for robbery were provided. The firearm definition was not required and did not relate to the defense of mistaken identity. The clear strategy employed throughout the trial was that defendant was misidentified and it was a coincidence when he was found sitting in the Lexus several hours after the robberies occurred. The jury instruction defining a firearm was not warranted to present this defense. In reviewing the attorneys' performance and the strategy presented at trial, we cannot say that the failure to request the jury instruction was objectively unreasonable. Additionally, defendant cannot show prejudice such that the result of the trial would have been different if the jury had been given the definition of a firearm. Pearson testified in detail about armed robbery and the presence of a

firearm, including his familiarity with firearms. He identified defendant in a photo array and in court. Defendant has not satisfied either prong for ineffective assistance of counsel. Accordingly, defendant's claim of ineffective assistance fails.

¶ 51    Defendant next asserts that the trial court abused its discretion in denying his motion for a mistrial. Specifically, defendant contends that Officer Breen's testimony that if defendant gave his real name then his name would appear in the system "unambiguously informed the jury that [defendant] had a prior arrest record ***." The State responds that the trial court cured any error by sustaining defendant's timely objection and instructing the jury to disregard the testimony.

¶ 52    "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice.  The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). "An abuse of discretion exists only when the trial court's ruling is 'arbitrary, fanciful or unreasonable or where no reasonable [person] would take the view adopted by the trial court.' " *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 54 (quoting *People v. Santos,* 211 Ill.2d 395, 401 (2004)). "Generally, if a timely objection is made at trial to improper interrogation, the court can cure the error by sustaining the objection or instructing the jury to disregard the question and answer." *Id*.

¶ 53    Here, the complained of testimony occurred during Officer Breen's direct examination. Officer Breen testified regarding processing defendant following his arrest. He stated that processing an individual involved "[g]etting their name, date of birth, address, looking up their information in the Secretary of State data to verify who they are, fill out an arrest report, fingerprinting, photographing." During the processing procedure, defendant provided the name Deonte Ellis with a birthdate of April 30, 1998, and an address on Drexel Boulevard. When the

officer checked the system, the search yielded no results. Officer Breen returned and "asked [defendant] again what his real name and date of birth was. That if he had been arrested before that his name and date of birth would come up in the system." At that point, defendant objected, and the trial court sustained the objection and told the jury to disregard the last answer.

¶ 54    At the conclusion of the officer's testimony, defendant moved for a mistrial. The trial court denied the motion and observed that Officer Breen "wasn't asked and didn't say that he found him in the data base under Deandre Jackson. Just that he didn't believe his name was Deonte Ellis. He asked him for a different name." The court further stated, "There was no reference made whatsoever about finding it in the data base for any reason."

¶ 55    Defendant contends that this testimony constituted evidence of other crimes and was inadmissible. He argues that this testimony differs from prior cases in which testimony that a defendant's DNA, photograph, or fingerprints were in a database was found to be admissible because it was not relevant in this instant case. See *People v. Jackson*, 232 Ill. 2d 246, 267 (2009) (finding no abuse of discretion in the trial court allowing limited testimony about a DNA database); *People v. Jackson*, 304 Ill. App. 3d 883, 895 (1999) (finding no error in testimony referring to a computer database as a source for the defendant's fingerprints because the jury also heard that the database included fingerprints for arrested individuals, police officers, and government workers); *People v. Meeks*, 382 Ill. App. 3d 81, 88 (2008) (finding no error in testimony referencing the defendant's photograph found in a database and compared it to similar databases for fingerprints that stored photographs for individuals unrelated to criminal activity); and *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 72 (no error in reference to the defendant's DNA in a database where no suggestion was made that it was on file due to criminal activity).

¶ 56    We find these comparisons to be distinguishable from the testimony at issue in this case.

Defendant asserts that the "other crimes evidence was inadmissible because it had no relevance." However, this assertion misstates what occurred at trial. No evidence of other crimes evidence was found to be admissible. No evidence of past criminal activity was admitted, and thus, no question of relevance was raised. No testimony was offered that confirmed defendant's name was found in any database. Further, Officer Breen initially explained that part of processing an arrestee entailed searching a Secretary of State database to verify identity, which does not suggest criminal activity.

¶ 57    Significantly, an objection was immediately made after Officer Breen's statement which was quickly sustained, and the jury was instructed to disregard the answer. No further reference to defendant's name appearing in a police database or past criminal activity occurred at trial. Defendant's argument that the jury presumed he had a prior arrest record is speculation. We further disagree with defendant's contention that the evidence impacted the jury's verdicts since he was found guilty for the Pearson robbery and acquitted for the Barrera and Wen robberies. The evidence presented for those cases was different, in particular the identification testimony. Defense counsel spent a considerable portion of the closing argument arguing about the inconsistencies and inaccurate descriptions of defendant given by Barrera and Wen. Moreover, if this statement by Officer Breen influenced the jury to find him guilty of the Pearson robbery, then the same statement would have impacted the verdict in the Barrera and Wen robberies, which resulted in not guilty verdicts. We conclude that any prejudice from the officer's statement was properly cured by a sustained objection and an instruction to disregard. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

¶ 58    Next, defendant argues that he was denied a fair trial when the prosecutor made improper remarks during the State's rebuttal closing argument. Specifically, defendant contends that: (1)

the prosecutor used a dehumanizing metaphor to describe defendant circling his prey; (2) the prosecutor falsely claimed that the defense relied on a conspiracy against defendant; and (3) the prosecutor trivialized the standard of proof beyond a reasonable doubt. Defendant concedes that these claims were forfeited on appeal because no objection was raised for two of these comments and none of the alleged improper comments were raised in his motion for a new trial. However, he asks this court to review these remarks under the plain error standard.

¶ 59     To preserve an issue for review, defendant must object both at trial and in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do so operates as a forfeiture as to that issue on appeal. *People v. Ward*, 154 Ill. 2d 272, 293 (1992). Supreme Court Rule 615(a) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain error rule "allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). However, the plain error rule "is not 'a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *Herron*, 215 Ill. 2d at 177 (quoting *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). Rather, the supreme court has held that the plain error rule is a narrow and limited exception to the general rules of forfeiture. *Id*.

¶ 60     Defendant carries the burden of persuasion under both prongs of the plain error rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009). Defendant asserts that these alleged errors would qualify as a plain error under both prongs. However, "[t]he initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 61     Generally, a prosecutor is given wide latitude in closing arguments, although his or her comments must be based on the facts in evidence or upon reasonable inferences drawn therefrom. *People v. Page*, 156 Ill. 2d 258, 276 (1993). "The prosecutor has the right to comment on the evidence and to draw all legitimate inferences deducible therefrom, even if they are unfavorable to the defendant." *People v. Simms*, 192 Ill. 2d 348, 396 (2000). "During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses." *People v. McGee*, 2015 IL App (1st) 130367, ¶ 56. Moreover, "closing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). "Statements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009).

¶ 62     "In reviewing comments made at closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123. "Prosecutorial misconduct warrants reversal only if it 'caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial.' " *People v. Love*, 377 Ill. App. 3d 306, 313

(2007) (quoting *People v. Johnson*, 208 Ill. 2d 53, 115 (2004)). "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123. "The trial court may cure errors by giving the jury proper instructions on the law to be applied; informing the jury that arguments are not themselves evidence and must be disregarded if not supported by the evidence at trial; or sustaining the defendant's objections and instructing the jury to disregard the inappropriate remark." *Simms*, 192 Ill. 2d at 396-97.

¶ 63    In the first comment, defendant asserts that the prosecutor "demeaned and dehumanized" him by "characterizing him as a roaming criminal stalking prey." The prosecutor made the following argument, which includes the specific complained of statement.

> "You are going to see that gold Lexus circling around the area, circling for its pray [*sic*] and its pray [*sic*] on September 23rd happens to be Cecilia and Kenyo. You will see on the video clips walking down.
>
> Now, those two Kenyo and Cecilia they are small, they are kind of small little students, they are walking down the street at 4:00 in the morning. They have no idea what's coming for them. They have no idea that moments before that gold Lexus with the defendant and his team of robbers are circling around that area looking for someone to rob. Looking for someone. Those [*sic*]
> video corroborates that."

The prosecutor continued to discuss the videos admitted and played during the trial that showed the Lexus SUV as well as Barrera and Wen in the area of the robbery.

¶ 64    Defendant cites *People v. Johnson*, 208 Ill. 2d 53, 80 (2004), *People v. Ivory*, 333 Ill.

App. 3d 505, 516-17 (2002), and *People v. Johnson*, 119 Ill. 2d 119, 139 (1987) for support, but the improper comments in those cases are distinguishable because, in each of those cases, the prosecutors directly compared the defendants to animals. See, *e.g.*, *Johnson*, 208 Ill. 2d at 80 (prosecutor referred to defendant as animal by saying, " 'If you run with the pack, you share the kill.' "); *Ivory*, 333 Ill. App. 3d at 517 (prosecutor "directly referred to defendant as an animal," saying that defendant was "just a wolf in sheep's clothing" and "was part of a pack of predators" (internal quotation marks omitted)); *Johnson*, 119 Ill. 2d at 139 (prosecutor described the victims as having been " 'butchered by an animal, and that animal is among us today, and he sits right there' ").

¶ 65     However, in the present case, the prosecutor did not refer to defendant to an animal, but rather referred to Barrera and Wen as prey for the Lexus SUV. "Prey" is defined as "one that is helpless or unable to resist attack : victim." Merriam-Webster Collegiate Dictionary 924 (10th ed. 1995). Barrera and Wen were victims to an attack; under this definition, they were prey. Further, in context, the remarks were describing the offenders' behavior in the SUV, as shown in the videos, as predatory. This comparison was a reasonable inference based on the evidence presented which showed the SUV circling the area before the robbery. Accordingly, we find no error in this comment.

¶ 66     Defendant next contends that the prosecutor "invented a non-existent defense theory that there had been a law enforcement conspiracy" against defendant and "[a]t no time did defense counsel accuse any witnesses of deliberately lying or conspiring with others to lie." The State maintains that the comment was an invited response to defense counsel's argument accusing the police officers of lying.

¶ 67     Defense counsel made the following comment during closing argument.

"The state brought out many witnesses who were all very emphatic especially today how they all did their independent investigation separate from each other. No one overlapped. No one talked to each other. No one knew anything. It was all very compartmentalized.

We know that's not actually true. We know that's not true because of what Kenyo told you yesterday. What happened to Kenyo, Cecilia, and Rafael is terrible. It is horrible what happened to them. It is horrible that their person was infringed upon. Their personal space or property was taken. Nobody wants that to happen.

But Kenyo came up here and he told you to the best of his ability what he could remember. But this is all about perception.

The officers told you they did not tell him there was a suspect in custody. They did not tell him they knew a suspect was in custody.

But Kenyo told you yesterday one of the first things they told him when they spoke to the officer he knew they had a suspect in custody and he knew they were bringing a photo array to ID this defendant. Accuracy and certainty don't always go hand-in-hand.

Of course, they are certain it was Deandre Jackson that was the one that night with a gun. He is the one they want to pay for what happened to them. They want to have somebody found accountable for this."

¶ 68    Defense counsel later argued,

"All of these police officers came in here and they told you they didn't know about each other. They didn't know about everything and they did their

27

independent investigations. Well, yes, they did."

Defense counsel also argued that, "But what the state wants you to believe and what they just argued to you is coincidence means guilt."

¶ 69    In rebuttal argument, the prosecutor responded to defense counsel's argument as follows.

"It's not a police conspiracy to put a case on Deandre Jackson because they have something against Deandre Jackson. It's not. If it was some sort of police conspiracy, the police had to have conspired with -- police from different districts mind you, you have detectives from the second district, detectives from the 9th district who don't know about each other's investigation but they just get assigned randomly.

You heard from Detective Verta today. He couldn't find Rafael. He suspended his case. He wasn't even working on this case. He didn't even know there were any leads in this case.

You have Detective Corral who randomly finds out information and then Officer Gentile he works in a different district altogether of Chicago. If it wasn't for the good instincts of Officer Gentile doing his job looking around, protecting his partner, he wouldn't have never [*sic*] found those proceeds."

¶ 70    Defendant further argues that the prosecutor's comments amounted to an assertion that in order to acquit defendant the jurors would have to believe all of the State witnesses were lying and shifted the burden of proof. Defendant contends that this case is akin to *People v. Ridley*, 199 Ill. App. 3d 487, 493 (1990), where the prosecutor made "a statement to the jury that in order to believe the defense witnesses, it must find that the State witnesses were lying." However, we find *Ridley* to be distinguishable from the present case because the prosecutor's comments did

28

not suggest that the jury would have to conclude all the State's witnesses were lying in order to acquit defendant. Rather, the prosecutor was responding to defense counsel's argument.

¶ 71     As previously noted, a prosecutor's statements will not be held improper if they were provoked or invited by the defense counsel's argument. *Glasper*, 234 Ill. 2d at 204. These comments by the prosecutor were made in response to defense counsel's assertion that the police were not truthful in their testimony about the independent investigations that led to defendant's trial for the armed robberies. While defense counsel did not use the term "conspiracy," her arguments suggested impropriety by the police officers in charging defendant with the offenses. We find that the prosecutor's comments were provoked by defense counsel's argument and were not in error.

¶ 72     Defendant finally asserts that the prosecutor "belittled the standard of proof beyond a reasonable doubt by telling the jury that it does not mean 'any doubt' and 'is met everyday in this courthouse.' " The State maintains that the burden of proof comment was proper.

¶ 73     During rebuttal argument, the prosecutor stated, "Now the standard is beyond a reasonable doubt. That doesn't mean any doubt. That is a burden that is met everyday in this courthouse." Defense counsel then objected, which the trial court overruled. Defendant contends that by overruling the objection, the trial court "signaled to the jury that the argument was proper."

¶ 74     We find no error in the comment. Regarding the statement that reasonable doubt "doesn't mean any doubt," Illinois court have consistently held that similar statements did not improperly shift the burden of proof. See *People v. Moody*, 2016 IL App (1st) 130071, ¶ 64 (" 'It's not beyond all doubt. It's not beyond a shadow of a doubt. It's not beyond a scintilla of a doubt. It's beyond a reasonable doubt.' "); *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 90(" 'beyond

a reasonable doubt isn't any doubt in the world, any crazy doubt' " (Emphasis omitted.)); *People v. Burney*, 2011 IL App (4th) 100343,¶ 66 (" '["]beyond a reasonable doubt["] does not mean ["]beyond all doubt ["]' " and " 'Don't raise that bar higher than it needs to be ladies and gentlemen for the State to prove. It's not beyond all doubt.' "); *People v. Laugharn*, 297 Ill. App. 3d 807, 810 (1998) (" 'Now, that's not beyond all doubt or any doubt, but beyond a reasonable doubt.' " (Emphasis omitted.)); *People v. Renslow*, 98 Ill. App. 3d 288, 295 (1981) (" 'Well it's not beyond all doubt; it's beyond a reasonable doubt.' "). The prosecutor in the present case used similar terminology to discuss the reasonable doubt standard.

¶ 75     As to the statement that the reasonable doubt burden "is met everyday in this courthouse," the Illinois Supreme Court has repeatedly rejected arguments that such comments minimize the burden of proof. See *People v. Kidd*, 175 Ill. 2d 1, 40 (1996) (prosecutor's rebuttal argument that the State's burden of proof " 'is a burden of proof that is met in courtrooms across this county and in this building each and every day' " was not error); *People v. Gacho*, 122 Ill. 2d 221, 255 (1988) (comments that proving a defendant guilty beyond a reasonable doubt " 'happens in every courtroom in this building, in every criminal court building in this county, every county in this state and every state in this country' " was not error); *People v. Collins*, 106 Ill. 2d 237, 277 (1985) (prosecutor commented that reasonable-doubt standard " 'is the same burden of proof in every case that is tried in this courtroom, every case that is tried in this county, and every case that is tried in this country' " and that " '[t]he penitentiary is full of people like [the defendants] who have been proved guilty beyond a reasonable doubt' "); *People v. Bryant*, 94 Ill. 2d 514, 523-24 (1983) (prosecutor's comment that burden of proof beyond reasonable doubt was " 'met each and every day in courts' " did not reduce State's burden).

¶ 76     Defendant cites *People v. Burman*, 2013 IL App (2d) 110807, to support his argument

that the prosecutor's comments were improper. In *Burman*, the prosecutor told the jury that " '[w]e have to prove [defendant's guilt] beyond a reasonable doubt. However, it's not beyond all doubt. It's not beyond an unreasonable doubt.' " *Id.* ¶ 40. While the Second District found the remarks improperly defined reasonable doubt by "describing what it was not," the court concluded that no reversible error occurred. *Id.* ¶¶ 44-45. The *Burman* court held that a misstatement of the burden of proof, to any extent, does not amount to plain error, absent a finding that the comments were "either so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten a deterioration of the judicial process." (Internal quotation marks omitted.) *Id.* ¶ 45. Therefore, even if we were to find the comments were improper, which we do not, defendant has not shown how the error was so inflammatory as to deprive him of a fair trial and amount to reversible error. Accordingly, we find no error in these comments.

¶ 77    Based on our analysis of the complained-of comments, we conclude that defendant has failed to establish a clear or obvious error in the prosecutor's statements during rebuttal argument to warrant reversal under the plain error doctrine.

¶ 78    Finally, defendant argues that the cumulative effect of the claimed errors warrants a new trial. However, since we have concluded that no reversible error exists, defendant's claim for cumulative error fails. "The whole can be no greater than the sum of its parts ***." *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984). Generally, there is no cumulative error where none of the alleged errors amounts to reversible error. *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002).

¶ 79    Based on the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 80    Affirmed.